## County of Allegheny, Appellant, *v.* The Church of Jesus Christ, Appellee.

Argued May 7, 1974, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Samuel P. Kamin,* Assistant County Solicitor, with him *Francis A. Barry,* County Solicitor, for appellant.

*Leonard M. Mendelson,* with him *Hollinshead and Mendelson,* for appellee.

Opinion by Judge Crumlish, Jr., August 1, 1974:

Preliminary Objections by the Church of Jesus Christ (Appellee) to the declaration of taking in eminent domain filed by the County of Allegheny (Appellant) were sustained by the Court of Common Pleas of Allegheny County.

This appeal followed, which we sustain and reverse the court below.

In May 1967, Appellee engaged the services of an architect and instructed him to prepare plans and specifications for the construction of a church to be erected on its Findlay Township site in Allegheny County, Pennsylvania. In May 1969, a construction contract was executed and shortly thereafter (July 2, 1969) the contractor had completed all the rough grading and 75% of the foundation excavation.

It was at this time that the architect was requested to meet with Clifford A. Barbarow, Deputy Chief of Air Traffic Control Facility, Greater Pittsburgh Airport. At this meeting, the architect was told by Eric C. Jones, Assistant Director, Department of Aviation, Allegheny County, that the Airport planned to expand its facilities and that his client's property was a part of the acquisition plans. Not unnaturally the architect sought to determine whether his project should proceed. It was at this juncture that Jones "advised" him to cease construction activity.[1]

The architect accepted the "advice" and ordered cessation of the construction on July 3, 1969.

On or about August 6, 1969, the Airport expansion program was publicized by Appellant. On August 14, 1969, the Allegheny County Commissioners approved a master plan for the expansion, which included Appellee's property.

---

[1] The context of this exchange and its legal bearing on this case will be fully noted later.

Appellant's appraisers commenced negotiations for compensation for the acquisition of its property forthwith. No settlement figure was reached at any of the negotiating conferences.

On April 3, 1972, Appellant filed a declaration of taking formally condemning the property in question. Appellee filed preliminary objections alleging that a de facto condemnation of its property had occurred in June, 1969. An answer to the preliminary objections was filed and, after a hearing, an Order was entered by the Court of Common Pleas sustaining the preliminary objections finding that a de facto taking of the property had occurred on July 2, 1969.

Although other issues have been advanced by both parties, disposition of this appeal turns on the determination of whether Appellant's conduct constituted a de facto taking of Appellee's property.

The concept of "de facto" taking is recognized by Section 502(e) of the Eminent Domain Code of 1964, Act of June 22, 1964, Special Sess., P. L. 84, 26 P.S. §1-502(e), which provides: "If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers . . . ."[2]

The Appellee's position throughout has been that Appellant's advice to Appellee to halt construction, along with ratification and publication of the plan for expansion, and notification to property owners within the proposed project area of impending condemnation, constituted a "de facto" taking. With this we must disagree.

___

[2] Here Appellee did not file a petition for the appointment of viewers, but raised the issue of a de facto taking by preliminary objections to the Appellant's declaration of taking. See *Charles Nelis v. Redevelopment Authority of Allegheny County*, 12 Pa. Commonwealth Ct. 338, 315 A. 2d 893 (1974).

In *Commonwealth Appeal,* 422 Pa. 72, 221 A. 2d 289 (1966), the Supreme Court of Pennsylvania held that mere publicity concerning the proposed taking of property did not constitute a "de facto" taking. Thus the Appellant's ratification of the proposed plan and notification to affected landowners and the resultant publicity does not alone establish a "de facto" taking.

Appellee however stresses an additional factor, the Appellant's advice[3] to Appellee not to proceed with construction. We cannot view mere advice to the Appellee as in any way affecting Appellee's rights under the Eminent Domain Code. The decision still remained with Appellee as to whether to continue with construction. Had Appellee chosen to continue to build, we see no reason why Appellee would not have been appropriately compensated. *See Commonwealth Appeal, supra.*

We have reviewed the recent Pennsylvania Supreme Court decision in *Conroy-Prugh Glass Company v. Commonwealth of Pennsylvania,* 456 Pa. 384, 321 A. 2d 598 (1974), and do not find it dispositive of the case now before us. In *Conroy-Prugh, supra,* the publicity from an inevitable condemnation of condemnee's industrial buildings caused condemnee to lose tenants and substantial rental income. The Pennsylvania Supreme Court, per Justice O'BRIEN, held that the publicity about the inevitable condemnation caused a loss of tenants, making the property useless for its highest and best use— commercial property. Our reading of *Conroy-Prugh, supra,* reveals a holding tied closely to a factual situation where publicity incident to a proposed condemnation directly affects a realized income of the condemnee.

The factual situation here is different from *Conroy-Prugh, supra.* The publicity from the airport expansion project did not actually affect Appellee's income

---

[3] There is no evidence to support a finding that anything more than "advice" was imparted to Appellee's architect.

from the property, but only the feasibility of continuing the proposed construction.

We are not unaware of the difficult situation of Appellee. It has been sorely inconvenienced by the proposed expansion of the airport. However, if inconvenience to condemnee was the sole factor in determining a de facto taking, governmental bodies would face damages that would prohibit the planning and execution of public improvement projects. This was not the intent of the Legislature in enacting the concept of a de facto taking.

Order reversed.