**LEHIGH–NORTHAMPTON AIRPORT AUTHORITY, Appellant,**

v.

**WBF ASSOCIATES, L.P.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 1998.

Decided March 25, 1999.

Reargument Denied May 26, 1999.

---

Charles J. Fonzone, Allentown, for appellant.

Kevin T. Fogerty, Allentown, for appellee.

Before McGINLEY, J., FRIEDMAN, J., and NARICK, Senior Judge.

FRIEDMAN, Judge.

Lehigh–Northampton Airport Authority (LNAA) appeals from an order of the Court of Common Pleas of Lehigh County (trial court) which overruled LNAA's preliminary objections to the petition for appointment of

a board of viewers filed by WBF Associates, L.P. (WBF) and declared that a de facto taking of WBF's property occurred on September 30, 1996. The trial court's order also granted WBF's petition for appointment of a board of viewers and appointed members of the board of viewers to assess condemnation damages.

The trial court's relevant findings are summarized as follows. On September 27, 1990, WBF purchased an undeveloped 632–acre tract of land from C. Thomas Fuller, who retained a mortgage on the land.[1] (Trial court's Findings of Fact, Nos. 6–7.) The property, which lies within the Pennsylvania municipalities of East Allen . Township, Northampton County; Allen Township, Northampton County; and Hanover Township, Lehigh County, is located just north of the Lehigh Valley International Airport (Airport). The Airport is operated by LNAA. (Trial court's Findings of Fact, Nos. 3, 8–9.) WBF planned to develop the land into a planned residential development (PRD) of 1,488 residential units (Windwillow Project); a PRD constituted the highest and best use of WBF's property. (Trial court's Findings of Fact, Nos. 10, 16.)

Prior to taking title to the property, WBF entered into a joint venture arrangement with Lanid Corporation (Lanid), a New Jersey development company that had success-fully developed twelve PRDs at other locations; Lanid conducted a market study and determined that a demand existed for the proposed Windwillow Project. (Trial court's Findings of Fact, Nos. 11, 14–15.) Under the joint venture agreement, WBF was to raise 1.75 million dollars to purchase the property and pay for development costs; Lanid then was obligated to contribute $250,000. After making its initial contribution, Lanid could exercise an option to terminate the joint venture; however, if Lanid chose to continue its association with WBF, Lanid assumed an obligation to contribute an additional 1.5 million dollars to the Windwillow Project. (Trial court's Findings of Fact, Nos. 12–13.) By early 1994, WBF and Lanid had obtained zoning changes and PRD approvals from East Allen and Hanover Townships and were seeking approval for the development from Allen Township. (Trial court's Findings of Fact, Nos. 25–27.) WBF also had expended substantial development costs, retaining architectural, engineering and design professionals to assist in planning the Windwillow Project.[2]

However, the Windwillow Project was halted in January of 1994, when LNAA publicly announced an amendment to its Airport Master Plan (Resolution 2624), permitting expansion of the Airport by acquiring approximately 1,500 acres located north of the Airport.[3]

1. WBF was formed as a limited partnership in March of 1990, with Platinum Real Estate Holding Corporation as WBF's general corporate partner. (Trial court's Findings of Fact, Nos. 1, 5.) Don Schuman, the real estate broker for Fuller's property, was responsible for soliciting investors and establishing WBF as buyer of the property. Schuman originally created a private placement offering to generate capital for the purchase of the Fuller property in 1989; however, Schuman was diagnosed with cancer in that year and, as a result, the initial private placement offering was aborted before closing. (Trial court's Findings of Fact, Nos. 21–23.) The sale subsequently was restructured in 1990.

2. Witnesses testified that the sum of these costs was between one and a half and two million dollars. (R.R. at 1079a, 1140a.)

3. In 1989, LNAA commenced a master planning process to forecast Airport use. To facilitate this analysis, LNAA hired the LPA Group, Inc. (LPA Group) to complete an update to the Airport Master Plan, which was used to evaluate existing facilities and project future demand for the Airport. (Trial court's Findings of Fact, Nos. 17–18.) The results of the LPA Group study indicated that the Airport would be operating beyond its capacity in 16 years if no expansion plans were implemented. (R.R. at 8a, 101a.) To meet the Airport's forecasted demand, the LPA Group devised various expansion concepts, one of which involved constructing a runway north of the Airport. (Trial court's Findings of Fact, No. 19.) On October 9, 1991, an article appeared in The Morning Call newspaper discussing the possibility of the Airport's expansion. (Trial court's Findings of Fact, No. 24.) Subsequently, a Long Range Airport Layout Plan was approved and adopted by LNAA's Board of Governors identifying land that would be needed to accommodate future development required to meet the Airport's demand. (R.R. at 7a, 10a.) On December 21, 1993, LNAA's Board of Governors considered, but did not adopt, a proposed amendment to the Airport Master Plan. Thereafter, on January 6, 1994, an article appeared on the front page of The Morning Call with the headline "A–B–E [Airport] wants to condemn Windwillow,

In conjunction with its expansion plan, LNAA also amended its Long Range Airport Layout Plan to indicate the division of these 1,500 acres into two sections: (1) 664.4 acres designated as "land to remain in agricultural production until required for aviation development;" and (2) 827 acres designated as "undeveloped land required for compatible land use." (Trial court's Findings of Fact, No. 32; R.R. at 73a.). The proposed expansion area included all of WBF's 632 acres; a portion of WBF's property is situated in the area designated to remain agricultural for future aviation development, and the remainder is located in the area required for compatible land use. (Trial court's Findings of Fact, Nos. 32, 34–35.)

Announcement of the Airport expansion received widespread publicity throughout the Lehigh Valley, including a front page article in The Morning Call, a newspaper of general circulation in Allentown and surrounding counties. Further, after adopting Resolution 2624, LNAA started acquiring properties within the 1,500–acre expansion area; WBF's property is situated in the center of those

properties already acquired by LNAA.[4] All of LNAA's acquisition activities in and around the 1,500–acre expansion area have been widely publicized through the Morning Call newspaper. (Trial court's Findings of Fact, Nos. 36–39.)

The direct effect of LNAA's actions was to cause Lanid, WBF's development partner, to exercise its right to terminate its participation in the Windwillow Project because of the proposed Airport expansion. Despite diligent efforts, WBF was unable to attract new investment partners because no one was willing to finance a development which eventually was going to be condemned. Consequently, the Windwillow Project was unable to move forward for lack of financing. (Trial court's Findings of Fact, Nos. 40–41.) Although WBF had not experienced any internal financial difficulties prior to the announcement of the proposed Airport expansion, WBF now faced a funding crisis which led it to default on its first and second mortgages. Further, Fuller, the mortgagee of the property, instituted a foreclosure action on the second mortgage, which was decided

---

expansion would engulf land," (R.R. at 74a), discussing the proposed 1,500–acre expansion of the Airport to the north. At a January 25, 1994 Board of Governors' meeting, LNAA adopted Resolution 2624, which formally amended the Airport Master Plan to include the acquisition of 1,500 acres of undeveloped land located north of the Airport to be held for future Airport development, with acquisitions subject to approval by the Board of Governors and availability of funds. (Trial court's Findings of Fact, Nos. 28–31, 33; R.R. at 117a, 125a.) WBF's entire property is located within this 1,500 acres, in an area designated by LNAA as an area of "ultimate development." (Trial court's Findings of Fact, No. 35.)

4. In June of 1994, LNAA acquired the Sunny Slope property by amicable agreement from the Jaindl family; this property is located in the aviation development area directly south of WBF's tract. In September of 1994, LNAA amicably acquired property from Harold Fulmer that is located in the aviation development area and abuts a portion of the eastern side of the WBF property. In October of 1994, LNAA amicably acquired property owned by Grace Tindula that also is located in the aviation development area, east and southeast of the Fulmer tract. In August of 1995, LNAA condemned Pheasant Cove, a Jaindl property situated in the compatible land use section of the 1,500–acre expansion area and located east of the Fulmer and Tindula tracts. George Doughty, LNAA's Executive Di-

rector, testified that Pheasant Cove was acquired when LNAA learned that the Jaindl family wanted to move forward with a planned subdivision of single family dwellings deemed non-compatible with the Airport. (R.R. at 20.5a–21a, 34a–35a.) In November of 1995, LNAA amicably acquired the Starbare property located in the compatible land use area west of the WBF tract. In December of 1995, LNAA acquired the Sovereign Bank property by condemnation; this property is in the aviation development area situated west of the WBF tract. In January of 1996, LNAA acquired property from ABE Industrial Associates that is located in the aviation development area west and southwest of WBF's property. In February of 1997, LNAA acquired property known as Willowbrook Estates from the Fuller family; the property is located in the compatible land use area and northwest of the WBF tract. In September of 1997, prompted by the filing of subdivision plans to build housing units on the property, LNAA authorized the condemnation of Willowbrook East, owned by the Fuller family and located in both the aviation development area and the compatible land use area. (R.R. at 35a–37a.) LNAA also has been negotiating to acquire, or will condemn, property owned by Richard Smith and property of Lehigh Valley Industrial Park II; both properties are located west of the WBF tract in the aviation development area of the proposed expansion. (Trial court's Findings of Fact, Nos. 36–37, R.R. at 23a.)

in favor of Fuller in June of 1997. In September of 1997, the property was listed for upset tax sale. Although WBF was able to raise the funds necessary to pay the 1995 taxes and, thus, avoid the tax sale, WBF has not paid the taxes due for 1996 and 1997 and has no access to additional funding. (Trial court's Findings of Fact, Nos. 42–49; R.R. at 1064a–72a.)

On September 30, 1996, WBF filed a petition for appointment of a board of viewers pursuant to section 502(e) of the Eminent Domain Code (Code),[5] alleging a de facto taking of its property occurred because of the financial effects resulting from LNAA's public announcement of its Airport expansion plan, LNAA's acquisition of properties surrounding WBF's property and the consequential demise of the Windwillow Project. LNAA then filed preliminary objections to WBF's petition for appointment of a board of viewers.[6] In lieu of an evidentiary hearing, the parties agreed to present evidence before the trial court consisting of deposition testimony from LNAA's Executive Director, George Doughty; from the Airport's Director of Planning and Engineering, Lawrence Krauter; from former Vice–President of Lanid, Robert McNally; and from WBF witnesses Don Shuman and Marc Sznajderman.[7] The record also included pleadings, affidavits, record papers, discovery responses and numerous exhibits. Based upon the extensive record, briefing and oral argument, the trial court made findings from which it determined that WBF successfully established that a de facto taking of its property had, in fact, occurred. Thus, the trial court dismissed LNAA's preliminary objections and granted WBF's petition for appointment of a board of viewers, fixing the date of taking as September 30, 1996. We now are asked to decide whether the trial court's findings of fact are supported by the record and whether those facts are sufficient to constitute a de facto taking of WBF's property by LNAA.[8]

A de facto taking under section 502(e) of the Code occurs when an entity clothed with the power of eminent domain[9] substantially deprives an owner of the use and enjoyment of his or her property. *Conroy–Prugh Glass Company v. Department of Transportation*, 456 Pa. 384, 321 A.2d 598 (1974). Where a de facto taking is alleged, property owners bear a heavy burden of proof and must show that exceptional circumstances exist which substantially deprive them of the use of their property and, further, that such deprivation is the direct and necessary consequence of the actions of the entity having the power of eminent domain. *In re City of Allentown*, 125 Pa.Cmwlth. 290, 557 A.2d 1147 (1989). There is no bright line test to determine when government action is deemed to result in a de facto taking; instead, each case must be examined and de-

5. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–502(e), provides that where a compensable injury is suffered for which no declaration of taking has been filed, a condemnee may file a petition for the appointment of a board of viewers setting forth such injury.

6. Preliminary objections are the exclusive method under the Code of raising objections to a petition for the appointment of a board of viewers alleging a de facto taking. *McGaffic v. Redevelopment Authority of the City of New Castle*, 120 Pa.Cmwlth. 199, 548 A.2d 653 (1988), *appeal denied*, 523 Pa. 644, 565 A.2d 1168 and 523 Pa. 645, 565 A.2d 1169 (1989).

7. Prior to his involvement with WBF, Shuman had a business relationship with Fuller, then the owner of the subject property, and Fuller contacted Shuman to handle the sale of that property. As real estate agent for the property, Shuman put together the investor group, subsequently known as WBF, to raise capital for the purchase of Fuller's property. (R.R. at 1094a–96a, 1100a–02a.) Sznajderman was involved with WBF as a limited partner investor from 1990 to 1995, at which time he became president of Platinum Real Estate Holding Corporation, WBF's general corporate partner. (R.R. at 1035a–36a.)

8. Our scope of review of a trial court's dismissal of preliminary objections to a petition for appointment of a board of viewers is limited to determining whether the trial court's findings are supported by competent evidence in the record, whether the trial court abused its discretion or whether it committed an error of law. *Elser v. Department of Transportation*, 651 A.2d 567 (Pa.Cmwlth.1994), *appeal denied*, 540 Pa. 650, 659 A.2d 988 (1995).

9. The trial court found, and it is not disputed, that LNAA is a municipal authority possessing the power of eminent domain. (Trial court Findings of Fact, Nos. 2, 4.)

cided on its own facts. Thus, courts must provide, with case by case development, the needed doctrinal elaboration. *In re: Petition of 1301 Filbert Limited Partnership for the Appointment of Viewers,* 64 Pa.Cmwlth. 605, 441 A.2d 1345 (1982). With this need in mind, we have reviewed numerous cases to aid our determination here; some of these cases hold that a de facto taking occurred as a result of government activity while others hold that government action did not amount to a de facto taking of property.

In the latter category of cases, our supreme court has held that simply approving and recording plans which designate the location of a proposed highway project, along with attendant publicity, did not constitute a taking of property that ultimately would be affected by that highway. *In re Land for L.R. 1062 & 1068,* 422 Pa. 72, 221 A.2d 289 (1966) (*Commonwealth Appeal*). In *Commonwealth Appeal,* our supreme court specifically noted that, notwithstanding the plans for the proposed highway, the property owners retained the right to treat their property in any manner they pleased prior to formal condemnation and that, despite receiving notices to the contrary, affected landowners would be compensated at the time of taking for any pre-condemnation improvements to the property.

Further, we have held that the approval and funding of a government project, even when followed by notices to and negotiations with affected property owners, as well as the acquisition of other properties in the designated area, did not, in themselves, constitute a de facto taking. *Redevelopment Authority of the City of Hazleton v. Hudock,* 2 Pa. Cmwlth. 670, 281 A.2d 914 (1971). In *Hazleton,* the Redevelopment Authority of the City of Hazleton, acting pursuant to a redevelopment plan which included a lot owned by the Hudocks, negotiated with the Hudocks to acquire their premises. Before the final offer was accepted, the subject property was extensively damaged in a fire. In addition to the proceeds from the fire insurance, the Hudocks claimed entitlement to the pre-fire value of the land, claiming that a constructive taking of the property had occurred before the fire. We disagreed, concluding that the condemnees had exercised full control over the property and enjoyed all the benefits of ownership until the condemnation was legally effected. We also noted that while the government activities may have affected the fair market value of the real estate adversely, redress for such impact was supplied by section 604 of the Code.[10]

In *County of Allegheny v. Church of Jesus Christ,* 14 Pa.Cmwlth. 510, 322 A.2d 803 (1974), the Church of Jesus Christ, in 1969, engaged an architect to prepare plans for the construction of a church building to be erected on church property. When construction was partially completed, the assistant director of the Allegheny County Department of Aviation informed the architect of planned airport expansion which would necessitate acquisition of the church's property. The assistant director advised the architect to cease construction activity, and the architect accepted this advice. Subsequently, the proposed airport expansion plan was ratified and publicized, and notification of impending condemnation was sent to affected landowners. The county formally condemned the church's property in mid-1972, and the church filed preliminary objections alleging that the county's pre-condemnation activities constituted a de facto taking of its property prior to the date of formal condemnation. We disagreed that the advice to cease construction, publication of the expansion plan and notification to property owners in the expansion area amounted to a de facto taking of the property in 1969. We specifically noted that the church's income was unaffected by these activities, and we stressed that, despite the advice offered, the church retained the ability to continue with construction. We concluded that, had the church chosen to continue to

10. Section 604 of the Code provides:
Any change in the fair market value prior to the date of condemnation which the condemnor or condemnee establishes was substantially due to the general knowledge of the imminence of condemnation, other than that due to physical deterioration of the property within the reasonable control of the condemnee, shall be disregarded in determining fair market value.
26 P.S. § 1–604.

build, it would have been compensated appropriately at the time of formal condemnation.

In *Department of Transportation v. Securda and Company,* 16 Pa.Cmwlth. 40, 329 A.2d 296 (1974), another case in which we held that no de facto taking had occurred, we recognized that key among factors to be considered in determining whether a de facto taking can be established is the inevitability of formal condemnation. In *Securda,* the Department of Transportation (DOT) filed a plan demarcating right-of-way lines for a portion of Legislative Route 1075. The Commonwealth acquired all properties totally within the right-of-way lines, but postponed acquisition of properties only partially within the right-of-way. Thus, although DOT condemned the portion of Securda's property that lay within the right-of-way lines, it did not acquire the adjoining portion of the property not wholly within those lines. Securda filed a petition for appointment of viewers alleging a de facto condemnation of the unacquired portion of the property, which was vacant and plotted for building lots. We noted that the condemnation and purchases of nearby properties within the right-of-way marked with some certainty the path of the proposed highway, making condemnation of property in that path inevitable. We then stated that this inevitability of condemnation could deprive a property owner of the beneficial use and enjoyment of his property and, thereby, establish a de facto taking. However, in *Securda,* we determined that, despite the inevitability of eventual condemnation, the property owner failed to state a cause of action because it did not aver that the Commonwealth's actions impeded access to or use of the remaining property for its highest and best commercial use, and the property owner made no claim that it faced actual loss of the property due to the imminence of the condemnation. Of controlling significance in *Securda* was the fact that Securda enjoyed all benefits accruing to property owners, remaining free to use and develop its remaining lots as it wished until formal condemnation. At that time, Securda would be compensated for any pre-condemnation improvements made to the property, and section 604 of the Code would provide relief for any depreciation in the sales value of Securda's remaining lots.

Although the specific facts in *Commonwealth Appeal, Hazleton, Church of Jesus Christ* and *Securda* differ, our review of those cases reveals an underlying similarity. In each case, the government activity alleged did not substantially affect the property owner's immediate use of its property for the property's highest and best purpose or expose the owner to loss of the property. Further, because formal condemnation was preordained, property owners were ensured of adequate compensation for any improvements made prior to the formal taking and for any decline in fair market value caused by pre-condemnation activity. In each case, recognition of this reality was decisive in the determination that a de facto taking did not occur.

As would be expected then, these same defining circumstances did not exist in those cases where a de facto taking was deemed to have occurred. In *Conroy–Prugh,* our supreme court considered a claim of de facto taking by a property owner alleging that government actions not only interfered with the owner's use of the property but also exposed the owner to loss of the property prior to actual condemnation. In *Conroy–Prugh,* DOT promulgated, publicized and partly executed plans to extend Ohio River Boulevard in Pittsburgh. The Commonwealth prepared seven plans, each of which involved a taking of Conroy–Prugh's property, a tenanted commercial structure. After the plans were published, Conroy–Prugh began to lose tenants at such a rate that its rentals no longer covered its taxes and operating expenses; consequently, the property was scheduled for tax sale. Conroy–Prugh filed a petition for appointment of viewers alleging a de facto taking. In granting the petition, the court found that the condemnation of the property was inevitable because of where it was located; however, the court then emphasized that this property owner was not one whose property merely suffered a decline in value due to the inevitability of condemnation. Rather, the court pointed out that publicity about the imminent condemnation caused a loss of tenants and, thus, ren-

dered the property useless for its highest and best use as commercial property. Further, the court stressed that the property owner faced a threatened loss of the property prior to condemnation, thereby eliminating any remedy under section 604 of the Code once formal condemnation took place. *See also Department of Transportation v. Lawton,* 50 Pa.Cmwlth. 144, 412 A.2d 214 (1980); *Reingold v. Urban Redevelopment Authority of Pittsburgh,* 20 Pa.Cmwlth. 266, 341 A.2d 915 (1975).

In *Peter Roberts Enterprises, Inc. v. Department of Transportation,* 31 Pa.Cmwlth. 479, 376 A.2d 1028 (1977), the property owner, in 1968, purchased a thirty-one acre tract of unimproved land, intending to develop the entire property by erecting apartments and single family houses. In the previous year, DOT began design studies for a limited access highway which was to bisect Roberts' tract. When Roberts attempted to obtain building permits to develop the land, local authorities advised that Roberts could not develop the entire tract because the highway would divide it; moreover, the appearance that the planned highway would leave the northern portion of the tract landlocked eliminated the possibility of obtaining a permit for that portion of the property. In 1971, Roberts sold the southern portion of the tract to defray financial damages, but continually was unable to dispose of the rest of the property, which was subject to a mortgage. Subsequently, it became apparent that funding problems would delay the highway project until approximately 1980. Further, although subsequent revision of highway plans restored access to the northern portion of Roberts' property, Roberts' initial inability to develop the land meant that it could not generate income to satisfy the mortgage before it became due. As a result, Roberts faced foreclosure by its mortgagee and a total loss of the property. In agreeing that a de facto taking of Roberts' property had

occurred, we compared the facts in that case to those in *Securda* and *Conroy–Prugh* and concluded that one fact alone [11] placed the decision under the control of *Conroy–Prugh.* Because Roberts undisputedly faced the loss of its property through foreclosure, we held that, as in *Conroy–Prugh,* section 604 of the Code offered no protection to Roberts because it would not be the owner of the property when the condemnation eventually took place.

In *Filbert,* we set forth a "working principle" drawn from an examination of case law in the area of de facto condemnation, stating:

> An ascertainable legal pattern emerges when Conroy–Prugh and Peter Roberts, on the one hand, are compared with Commonwealth Appeal and its decisional progeny. That pattern, translated into a working principle, may be stated thus: Where a property is designated for formal condemnation pursuant to a planned, prospective public improvement, adverse interim consequences caused to the property by the prospect of condemnation will not constitute a de facto taking unless those interim consequences are that the owner is deprived of the use and enjoyment of the property, or is subjected to the loss of the property before formal condemnation can provide compensation. If there has been such an interim deprivation of use, or exposure to loss, then the principle of de facto taking becomes applicable to accelerate the time when the governmental authority must make compensation.

*Filbert,* 441 A.2d at 1357. Applying this standard to the present case, we now must ascertain whether WBF successfully established (1) that formal condemnation of its property was inevitable [12] and (2) that it faced substantial deprivation of the use and enjoyment of its property or exposure to the loss of its property (3) as a consequence of the prospect of formal condemnation.

---

**11.** Indeed, we underscored the significance of this solitary fact, stating "[a] potential loss of property to the mortgagee is the greatest deprivation a landowner could suffer, far exceeding interference with access, loss of profits, or diminution of meaningful, beneficial use of the property." *Peter Roberts,* 376 A.2d at 1031.

**12.** In *Filbert,* we recognized that, under the proper circumstances, a de facto taking might be established based on a government project's impact on a particular property, even though the government project does not contemplate formal condemnation of the property.

■ As to the inevitability of condemnation of WBF's property, we agree with WBF that the record contains ample proof, relied upon by the trial court, to establish that, although its timetable was uncertain, LNAA eventually would condemn and acquire WBF's land. Here, LNAA adopted Resolution 2624 to include acquisition for "ultimate development" of up to 1,500 acres of land located north of the Airport, with WBF's property located entirely within that 1,500 acres. Subsequent to adopting Resolution 2624, LNAA began to acquire properties in the designated expansion area; to date, LNAA has acquired nine properties, either through amicable agreement or condemnation, and is attempting to acquire still other properties. These acquired properties completely surround the WBF property in the expansion area, thus marking WBF's property as an inevitable target for formal condemnation. Indeed, LNAA's well-publicized acquisition of these neighboring properties, (see, e.g., R.R. at 154a–55a, 161a, 177a–78a, 212a), combined with the statements of LNAA's own representatives regarding the Airport's northward expansion,[13] (see e.g., R.R. at 11a, 18a–19a, 22a, 35a, 126a–27a), and the language of Resolution 2624 itself[14] make clear the inevitability of the taking of WBF's property.

■ In addition, the record supports the trial court's conclusion that LNAA's actions substantially deprived WBF of its ability to enjoy its property and develop it according to its highest and best use,[15] thereby placing

13. Doughty, LNAA's Executive Director, made repeated references to the fact that residential development was opposed on that portion of the expansion area designated for aviation development, (R.R. at 11a, 15a, 35a), and that the type of development envisioned in the Windwillow Project would not be considered appropriate for the compatible use area. (R.R. at 18a–19a, 20.5a, 35a.) Doughty also testified that, because acquisition of land in the expansion area depended on availability of funds, acquisition of properties had to be accomplished over a period of years as money became available; however, he indicated that LNAA anticipated acquisition of the entire aviation development portion of the expansion area. (R.R. at 22a, 1123a, 1142a–43a.) Krauter, the Airport's Director of Engineering and Planning, also testified that residential housing was not a land use ordinarily considered as complementary with an airport, and he confirmed that one property owner's decision to pursue such residential development in the compatible use area prompted LNAA's acquisition of that property. (R.R. at 58a–59a, 62a–63a.) Moreover, McNally testified that, in meetings with Doughty and Krauter, the two represented that, although currently lacking revenue to acquire WBF's property, LNAA would like to be able to buy that land because the planned development of that property by WBF was incompatible with future Airport expansion plans. (R.R. at 1226a–27a.)

14. As drawn up, Resolution 2624 provides:

WHEREAS, [LNAA] has been engaged for three years in a Master Planning process involving extensive study and analysis with regard to how best to provide for the long-term aviation needs of the Lehigh Valley; and

WHEREAS, it has been clearly established by this process that the forecast aviation demand cannot be accommodated on the existing [ ]Airport site; and

WHEREAS, additional land necessary for future expansion is available now, but likely to be developed for other purposes in the near future if not acquired by [LNAA]; and

WHEREAS, [LNAA] has been and continues to be engaged in good faith negotiations with the municipalities surrounding the Airport in order to reach agreement on the best alternative for future Airport development; and

WHEREAS, [LNAA] has a fiduciary responsibility to assure that future development alternatives are not foreclosed; and

WHEREAS, the acquisition of approximately 1500 acres of undeveloped land can preserve several options for future development; and

WHEREAS, the acquisition of additional land does not obligate [LNAA] to commit to any particular development alternative; and

WHEREAS, such land, if not developed for Airport purposes would remain a valuable community asset available for other public uses.

NOW THEREFORE, be it resolved that the Master Plan for the [ ] Airport is hereby amended to include the acquisition for future airport development of up to 1500 acres of land located generally north of the [ ] Airport, subject to specific acquisition approval by the Board and availability of funds.

(R.R. at 117a, emphasis added.) We take particular note that in the last "WHEREAS" clause, the language of Resolution 2624 indicates LNAA's intent to acquire and dedicate the entire 1,500 acres of land for public purposes, even if some of the land ultimately is not developed for Airport use.

15. LNAA asserts that WBF's land has not been rendered useless, pointing out that certain residential uses may be compatible with Airport operation and that the land can also be used for commercial, industrial or agricultural purposes. However, the fact that WBF's property might be

WBF at risk of losing the property as a result of a tax sale or foreclosure prior to formal condemnation. The adversity suffered by WBF here is akin to that visited upon the landowner in *Peter Roberts,* where the denial or impairment of the opportunity to develop the land according to its intended use meant the landowner could not generate income to pay the mortgage when it became due. Similarly, in this case, WBF is threatened with the loss of its property prior to formal condemnation. Here, Lanid elected to terminate its joint venture with WBF because of the Airport expansion plans, and alternate outside investors could not be obtained because of the threat of imminent condemnation of the property. This lack of funding, and WBF's consequent inability to pursue the Windwillow Project's income producing potential for the property, places WBF at risk of losing the property through foreclosure or tax sale. In fact, due to a lack of investment funds, WBF already has defaulted on its first and second mortgages on the property, and a mortgage foreclosure action instituted on the second mortgage was resolved against WBF in June of 1997. In addition, although WBF was able to raise sufficient funds to pay its 1995 taxes and, thus, avert one tax sale of the property, the threat of another upset tax sale is very real where WBF has been unable to pay the taxes due for 1996 or 1997.

The trial court also determined that WBF was deprived of the use of, and faced the potential loss of, its property as a direct consequence of LNAA's actions concerning the 1,500–acre Airport expansion. In making the determination of causation, the trial court relied upon the testimony of McNally, Shuman and Sznajderman, all three of whom offered testimony concerning the detrimental effect that LNAA's publicly announced Airport expansion plans and related activities had on the Windwillow Project. Specifically, McNally testified that Lanid elected to terminate the agreement with WBF because

Lanid believed that LNAA eventually would acquire Windwillow by condemnation, and, thus, the development never would be completed. (R.R. at 1232a–33a.) McNally clearly indicated that a great deal of money and expertise had gone into planning for the Windwillow Project and that the Project was extremely promising. Further, McNally testified that development was proceeding as expected but that LNAA's actions, including asking township representatives to delay or stop the approval process for the Windwillow Project and publicizing both the Airport expansion plans and the acquisition of nearby properties, were directly responsible for the Project's eventual failure. (R.R. at 1233a–41a.)

Like McNally, Shuman also testified that, although plans for the Windwillow Project had been progressing prior to publicity about the Airport expansion, Lanid decided to terminate the joint venture agreement with WBF after reaching the conclusion, based on LNAA's actions, that LNAA would acquire the property, and, thus, actual development of the PRD would never go forward. (R.R. at 1122a–23a.) Moreover, Shuman stated that, after Lanid removed itself from the project, Shuman was unable to attract other joint venture partners because they too saw the property as doomed to eventual condemnation. (R.R. at 1124a–25a, 1133a.)

Finally, Sznajderman confirmed that the highest and best use for WBF's property was the PRD envisioned by WBF and Lanid and that the PRD was proceeding as scheduled until LNAA's negative publicity regarding the long-range expansion plans for the Airport convinced Lanid that the Windwillow Project could not be built in its current design. (R.R. at 1044a–45a, 1057a–58a.) Sznajderman testified that, once Lanid withdrew, the project effectively was dead because, despite considerable efforts to secure alternate funding, other investors were reluctant to become involved in a project that eventually would be encompassed by the Air-

---

used for such other purposes is irrelevant where, as here, the record supports the trial court's finding that the highest and best use of WBF's property is as a PRD. *See Gaughen v. Department of Transportation,* 123 Pa.Cmwlth. 550, 554 A.2d 1008 (1989). We also note that part of WBF's

property was required to remain agricultural for future aviation development while the remainder was designated for compatible land use which, according to LNAA's own witnesses, did not include development as a PRD such as the Windwillow Project.

port expansion. (R.R. at ·1052a–53a, 1070a–78a.)

The trial court also relied on testimony from McNally and Shuman to reject the crux of LNAA's argument, i.e., that WBF's unfortunate situation was not due to LNAA's Airport expansion activities but, rather, could be blamed on WBF's internal financial difficulties in conjunction with WBF's failure to properly appreciate the risk of future Airport expansion.

As support for its assertion that WBF experienced internal financial difficulties, LNAA first contends that a one year hiatus in the Windwillow Project, from 1989 to 1990, proved that WBF experienced a financial crisis with respect to the Project. However, the trial court determined that the hiatus was in no way connected to WBF itself. The trial court noted that, in a letter dated December 13, 1990 and addressed to township officials, McNally explained that the delay was the result of a housing recession and problems with the primary lender for the project, First Atlantic Savings and Loan. (*See also* R.R. at 1115a–18a.) Further, McNally testified that, although First Atlantic Savings and Loan was taken over by the federal government, the development process for the Windwillow Project did not have to stop; rather, the situation forced Lanid to renegotiate with the United States government as its new lender. McNally further testified that Lanid's negotiations were successful. (R.R. at 1205a–07a.)

LNAA also attempts to bolster its assertion that WBF faced internal financial problems by pointing out that the original private placement offering, to generate capital for the property's purchase, was aborted without a closing in 1989 and had to be redone in 1990. However, relying on Shuman's testimony, the trial court found that the delay in closing the private placement offering did not indicate financial difficulties for WBF but, instead, occurred because Shuman was diagnosed with cancer and unable to proceed with the project for several months. (R.R. at 1106a, 1151a.)

■ Based on the testimony of Shuman, McNally and Sznajderman, the trial court found that WBF's inability to proceed with the Windwillow Project substantially deprived WBF of the beneficial use and enjoyment of its property as a direct and necessary consequence of LNAA's activities connected to the proposed Airport expansion.[16] (Trial court's Findings of Fact, Nos. 51–52.) LNAA maintains that the trial court erred in accepting the testimony of all of WBF's witnesses despite conflicts in the record; however, we recognize that the weight and credibility of testimonial evidence is for the trial court as factfinder, and, in that role, the trial court is free to credit or reject the testimony of any witness. *Filbert.* Because the testimony accepted by the trial court here provides substantial evidence to support its findings, we will not disturb those findings on appeal.

16. The trial court also rejected LNAA's contention that the failure of the development project was caused in part by WBF's failure to appreciate the risk of the potential Airport expansion. To support this argument, LNAA refers to a 1991 letter written by Scott Pidcock, an engineer on the Windwillow Project. The letter, sent to McNally, stated in pertinent part:

> I believe the October 9, 1991 Morning Call article is a matter we should discuss with Blake upon his return. Based upon almost 30 years of involvement with that Airport, it is very difficult to envision the magnitude of expansion recommended by the Airport's Florida–based planner would ever receive the enormous financial commitments required. The scale of improvement the planners envision which would impact the Windwillow tract is equivalent to that found at, for instance, Philadelphia International Airport. Consequently, while the master plan does not appear to rep-

resent a real threat to the development of the Windwillow parcel, it most certainly has introduced what will be a continuing obstacle with the municipalities and authorities we are dealing with on the project.

(R.R. at 210a.) Based on this letter, LNAA argues WBF should have known about the 1994 Airport expansion plans in 1991. We disagree that the letter would have put WBF on notice of an impending condemnation of its property at that time. Indeed, McNally testified that, if anything, this letter indicated that such a condemnation was unlikely. (R.R. at 1211a, 1229a–30a.) Further, as the trial court determined, even if LNAA's argument were accepted, this did not negate a finding that a de facto taking occurred because, despite any risk involved, WBF still would retain the right to develop its property and receive compensation after formal condemnation. *Church of Jesus Christ.*

Finally, LNAA argues that the trial court abused its discretion in failing to recognize that this case is factually similar to, and controlled by, *Filbert*. In *Filbert*, a partnership filed a petition for appointment of a board of viewers, alleging that the City of Philadelphia's (City) activities and publicity regarding a City tunnel project destroyed the commercial viability of the Essex Hotel (Essex) and, thereby, resulted in a de facto taking of the Essex. The partnership owned the Essex subject to a mortgage and was in the process of renovating the hotel for occupancy. After renovations had been started, the partnership experienced various problems in connection with the renovation efforts and realized that to complete renovations and repay debt so that the Essex could be opened for business, the partnership required additional financing. Although, initially, the partnership appeared able to arrange for such financing, the partnership's construction loan application ultimately was rejected when information about the nature and extent of construction activity on the tunnel project came to light.

There was no question that the City did not intend to condemn the Essex as part of the tunnel project; however, the partnership maintained that the City's actions rendered the Essex useless as a hotel because, for four years, tunnel construction would adversely affect the Essex. During that time, a pit would remain open, covered with planks, at the main entrance to the hotel, and noisy and unsightly construction would take place just outside the hotel. Accordingly, the lending institutions from which the partnership sought financing rejected the loan requests, believing that the expected work on the tunnel would interrupt operation of the Essex and prevent its success. The partnership claimed that, absent this funding, it faced total loss of the hotel through mortgage foreclosure.

At evidentiary hearings, the partnership presented testimony that the Essex would have been a successful enterprise but for the tunnel project, which would discourage potential guests and doom the Essex to failure. However, the trial court rejected that witness testimony as speculative and conjectural and ruled that no de facto taking of the hotel had occurred. Specifically, the trial court determined that the partnership did not meet its burden of showing that the alleged detriment underlying the claim of de facto taking was the direct and necessary consequence of the tunnel project.

In affirming the ruling that no de facto taking had occurred, we focused on this important element in the trial court's decision,[17] stating:

> Reduced to other terms, the critical ingredient in the [p]artnership's claim is the supposition that because of the construction activity that would take place in the street in front of the hotel, prospective patrons would, to a significant extent, reject the Essex as a place to stay. From that supposition, or premises, the [p]artnership asserted further that the impact of the [t]unnel construction activity on would-be patrons rendered the Essex venture an unsuitable investment for new lenders, and thus deprived the [p]artnership of the ability to refinance its outstanding mortgage and complete the hotel improvements.
>
> ... The lower court rejected as being doubtful, speculative and conjectural the [p]artnership's premises that the [t]unnel construction activity would deprive the Essex of the trade it would need to survive even if the hotel were able to open its

**17.** In *Filbert*, in rejecting the partnership's claim of a de facto taking, the trial court also emphasized that there was no inevitability of an actual taking because the City made it clear that it never intended to condemn the Essex. Moreover, the trial court concluded that the partnership should have known about the prospect of the tunnel project at the time it purchased the Essex; in fact, the court was skeptical about the motives underlying the partnership's purchase of the property. The trial court also found that Essex's need for additional financing was due to miscalculation and mismanagement of the hotel venture; further, the trial court found that the partnership had means to pay the defaulted mortgage to avoid foreclosure, but chose not to do so. In reviewing the trial court's determination, we recognized that none of these conclusions necessarily precluded a de facto taking; we then focused on the "important element" in the trial court's decision, i.e., the determination that the partnership had not met its burden of establishing that its alleged injury was the direct and necessary consequence of the tunnel project.

doors for business during the progress of the [t]unnel work. With this determination we agree.

The essence of the [p]artnership's claim in this case is a theory that the Essex Hotel and the business planned to be conducted there lost their present value as collateral because the [t]unnel work would drive away patrons to a critical extent. Assuming, without deciding, that the "pledgability" of the property is an incident of ownership, the applicability of the [p]artnership's theory would depend on making a conjectural supposition about future patronage. Private financial institutions may base their decisions on such projections, or suppositions; courts may not.

*Filbert,* 441 A.2d at 1359–60.

LNAA maintains that, as in *Filbert,* WBF's claim is linked to a prospective, conjectural injury for which the Code provides no relief. *See Central Bucks Joint School Building Authority v. Rawls,* 8 Pa.Cmwlth. 491, 303 A.2d 863 (1973). We do not agree.

Initially, we note that, in *Filbert,* the Essex already existed and was partially renovated; further, access to the Essex would be maintained, albeit curtailed by tunnel excavation work. The partnership, in claiming a de facto taking of the Essex, alleged that funding to complete renovations was not forthcoming because potential lenders recognized that future interference with access to the hotel's front door would result in a severe decline in patronage and eventually cause the Essex to fail as a commercial venture. Although witnesses rendered their opinion that this chain of events undoubtedly would occur, we agreed with the trial court that, for the purpose of compensation under the Code, it was mere conjecture to make such predictions about future patronage. Because the claim of de facto taking was linked to an alleged injury that was both prospective and

speculative, we recognized that the Code provided no relief.

However, whereas in *Filbert,* the partnership offered only speculative testimony of possible future effects on the property as a result of anticipated government actions, WBF here offered credible testimony of past events that created actual financial difficulties for WBF. The record supports the determination that LNAA's proposed Airport expansion and its accompanying publicity, property acquisitions and other connected activities precluded WBF's development of the subject property for its highest and best use where investors refused to become involved in the Windwillow Project because of the property's inevitable condemnation. Thus, the damage alleged here is neither prospective nor too speculative to be determined by a board of viewers.[18]

Accordingly, because substantial evidence supports the trial court's finding of a de facto taking of WBF's property, and because the trial court committed no legal error, we affirm.

### ORDER

AND NOW, this 25th day of March, 1999, the order of the Court of Common Pleas of Lehigh County, dated June 15, 1998, is hereby affirmed.

---

18. The trial court reasoned that Lanid had developed 12 larger developments successfully prior to becoming involved in the Windwillow Project and, prior to the public announcement of LNAA's plans for Airport expansion, was prepared to invest its resources and expertise in developing WBF's land. The trial court thus concluded that, because the homes built would have been sold had the property been developed, a board of viewers could establish the profits which WBF lost as a result of the proposed Airport expansion. Based on the record here, the trial court did not abuse its discretion in reaching this conclusion.