**THOMAS A. McELWEE & SON, INC. and John McElwee, Appellants**

v.

**SOUTHEASTERN PENNSYLVANIA Transportation Authority, a/k/a SEPTA.**

Commonwealth Court of Pennsylvania.

Argued March 1, 2006.
Decided April 6, 2006.

Francis J. Moran, Philadelphia, for appellants.

Michael Sklaroff, Philadelphia, for appellee.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge FRIEDMAN.

Thomas A. McElwee & Son, Inc. (Printing Company) and John McElwee (McElwee), (together, Appellants), appeal from the February 22, 2005, order of the Court of Common Pleas of Philadelphia County (trial court) sustaining the preliminary objections filed by the Southeastern Pennsylvania Transportation Authority (SEPTA) to Appellants' petition for a board of view to determine condemnation damages for an alleged *de facto* taking of property owned by McElwee. We reverse.

In 1998, SEPTA provided notice to certain area landowners in West Philadelphia regarding impending construction to extend the Market Street "El" train service route, a portion of SEPTA's public transit system in Philadelphia. SEPTA set up a system for handling public complaints and held community meetings for the affected areas.

The Printing Company has been situated at 6206–10 Market Street (Property), within the designated construction area,

since 1954. McElwee manages the business, which he took over from his father, Thomas McElwee, in December 1998. Thomas McElwee continued to work for the Printing Company as a part-time employee, along with two other full-time employees.

Beginning in January 2000, SEPTA's vehicles and construction debris blocked Appellants' driveway so that it could no longer be used to receive shipments or pick up deliveries; delivery trucks were forced to park some distance away, and McElwee and/or his employees used a hand-truck to move products from the delivery truck to the Printing Company. McElwee designated one employee to call SEPTA and complain. From September 22, 2002, through May 2003, the block in which the Printing Company was located was closed to traffic entirely during business hours, and McElwee occasionally had to park a block or two from the business.

The Printing Company began to turn down jobs in April and May 2003, and McElwee closed the business on May 1, 2003, with $20,000 in unpaid bills. In September 2003, Appellants petitioned the trial court for a board of view pursuant to section 502(e) of the Eminent Domain Code[1] (Petition), claiming a *de facto* taking of the Property; McElwee alleged that SEPTA's construction caused financial harm to the Printing Company, which ultimately resulted in the closing of the business. SEPTA filed timely preliminary objections to the Petition,[2] and Appellants filed an answer to the preliminary objections.

The trial court initially granted Appellants' Petition and entered an order appointing a board of view to assess condemnation damages. However, following argument on SEPTA's motion for reconsideration, the trial court vacated its prior order and directed that evidence be taken for purposes of ruling on SEPTA's preliminary objections. The parties agreed that the preliminary objections would be heard by the trial court on written submissions, and Appellants took depositions from: McElwee; Thomas McElwee; William Noris and Thomas DeFlavia, former employees of the Printing Company; as well as John Showler and James Coyne, Jr., former customers of the business.

McElwee testified regarding the practical and financial difficulties of running his business during three and one half years of SEPTA's construction. He stated that during a substantial portion of 2000, the business lost considerable productivity because access to the sole driveway for pickups and deliveries was blocked by construction vehicles and materials. (R.R. at 14a–34a.) McElwee explained that it formerly took five minutes to bring in stock, but transporting supplies by hand-truck often required taking his two employees off the job for more than an hour, during which time he had to shut down the presses. (R.R. at 24a, 52a–54a, *see also* Noris, N.T. at 172a.) McElwee also testified that the Printing Company lost its walk-in trade, which constituted about twenty percent of the business, resulting in a $60,000 financial loss between 1999 and 2000, from

---

1. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–502(e). This section of the Eminent Domain Code provides that where a compensable injury has been suffered for which no declaration of taking has been filed, a condemnee may file a petition for the appointment of a board of viewers setting forth such injury.

2. Preliminary objections are the exclusive method under the Eminent Domain Code of raising objections to a petition alleging a *de facto* taking. *Lehigh Northampton Airport Authority v. WBF Associates*, 728 A.2d 981 (Pa. Cmwlth.), *appeal denied*, 560 Pa. 751, 747 A.2d 372 (1999).

which the Printing Company never recovered. (R.R. at 26a–27a.) McElwee stated that when these difficulties continued in 2001, he had to reduce the hours of one of his employees. (R.R. at 34a–35a; *see also* Thomas McElwee, N.T. at 101a–02a; Noris N.T. at 159a, 164a.) McElwee asserted that when SEPTA ultimately closed the street entirely in the summer of 2002, his business was destroyed because he could not get needed materials. As he stated, the "driveway was the most important part of the business. Without it, there is no business." (R.R. at 49a.) According to McElwee, the total loss of the driveway meant he could no longer accept dated jobs; as a result, he lost clients and revenue and could not pay his bills. (R.R. at 42a–55a.) For the first time in its fifty-five-year history, Appellants had an IRS levy and intention to levy filed against it. (R.R. at 251a–53a.)

Thomas McElwee, who had operated the business for fifty years before turning over control to his son, confirmed that the driveway was the lifeline of the business and that denial of access to the driveway adversely affected the productivity of the business. (R.R. at 79a, 93a–95a, 101a–03a.) He also agreed that SEPTA's construction caused the Printing Company to lose twenty percent of its revenue because of the lost walk-in trade. (R.R. at 80a, 86a–87a.) Further, as the person in charge of the books, (R.R. at 101a), Thomas

McElwee stated that the business last showed a profit in 1999 and that gross receipts continually declined from 1999 until the business finally had to close in 2003.[3] (R.R. 87a–88a, 249a–50a.)

Noris and DeFlavia presented similar testimony regarding the adverse impact that SEPTA's construction had on the Printing Company. (R.R. at 141a–48a; 155a–57a.) In addition, Noris, the employee designated to register complaints with SEPTA, testified that he called SEPTA weekly in 2000 and 2001, but, because it proved to be a waste of time, he called less often in 2002. (R.R. at 152a–53a, 158a, 163a–64a.) Showler and Coyne both testified that they used the Printing Company for the printing needs of their respective organizations until McElwee advised them that the Printing Company could no longer handle these printing jobs because of the effect that SEPTA's construction had on the business. (R.R. at 176a–77a; 183a–85a.)

SEPTA provided no witnesses on its behalf, but did cross-examine Appellants' witnesses, eliciting, *inter alia*, that: deliveries ultimately reached the Printing Company, albeit not through the driveway; driveway access was available during non-business hours; and SEPTA had no record of calls from Appellants on its complaint log.[4]

---

**3.** James Flanagan, CPA, also testified on behalf of Appellants. Flanagan, who had been Appellants' accountant since 1999, verified the Printing Company's 2003 Statement of Revenues and Expenses and identified Appellants' income tax returns for 1999 through 2002, verifying that they were true and correct. (R.R. at 189a–92a.)

**4.** Frances M. Jones, Assistant General Manager of Government Affairs for SEPTA, was called as a witness by Appellants. Jones testified on direct examination that SEPTA had received numerous complaints from area resi-

dents and businesses concerning the dire impact of SEPTA's construction and SEPTA's lack of response to these complaints. (R.R. at 205a, 208a–09a.) Jones also identified a City Council Resolution that stated, in pertinent part, "[s]uch activities have been viewed by local business owners as negatively impacting sale revenues due to blocked sidewalks, fenced-in streets, and signs diverting not only vehicular traffic but pedestrian traffic as well. . . . 'Community watch-dog groups have been created solely for the purposes [sic] of examining the day-to-day activities of the SEPTA project and have found that the au-

After considering the evidence presented, the trial court reasoned as follows. *First,* both John and Thomas McElwee testified that twenty percent of the Printing Company's business was derived from walk-in customers from the neighborhood. *However,* much of the Printing Company's business was union-driven, and Appellants did not present any documentary evidence to support the twenty percent estimate. *Second,* Appellants' witnesses claimed that, after construction began, SEPTA workers often parked in Appellants' driveway, which impeded ingress and egress to the driveway. *However,* there was unobstructed access to the driveway early in the morning and late at night. *Third,* Appellants' witnesses claimed that, when the driveway was blocked, suppliers could not deliver goods to the business. *However,* McElwee gave only one example of a supplier who could not make a delivery, and that supplier returned the next day. *Fourth,* Appellants claimed that they lost customers when they could not meet deadlines due to the difficulty in receiving supplies. *However,* there never was a time when a delivery could not eventually be made. *Fifth,* Appellants claimed that the employee designated to complain to SEPTA did so dozens of times and, at one point, spoke with a business mitigation and development consultant for SEPTA, but the complaints were ignored. *However,* Appellants never filed a formal, written complaint, never attended any of the community programs which SEPTA set up to deal with business-related complaints and never called the police department or the Philadelphia Parking Authority about illegally parked cars and trucks blocking their driveway.

Based on this analysis, the trial court determined that Appellants failed to establish a *de facto* taking. The trial court concluded that SEPTA did not unreasonably interfere with Appellants' access to the Property and, thus, did not substantially deprive Appellants of the beneficial use and enjoyment of the Property. Further, the trial court concluded that Appellants failed to demonstrate that the Printing Company's decline and closing was caused by SEPTA's actions. (*See* trial ct. op. at 4–5.) Accordingly, the trial court issued an order sustaining SEPTA's preliminary objections, dismissing Appellants' Petition with prejudice and entering judgment in favor of SEPTA and against Appellants.

On appeal to this court,[5] Appellants argue that the record evidence establishes as a matter of law that SEPTA's construction activities resulted in a *de facto* condemnation of Appellants' Property, and the trial court erred by ignoring and/or misconstruing crucial evidence to reach a contrary result.

Specifically, Appellants contend that the trial court erred by failing to conclude that there was a *per se de facto* taking of the Property based on uncontradicted evidence

thority have [sic] not been responsive to the community concerns." (R.R. at 206a–07a.) However, on cross-examination, Jones gave a lengthy description of SEPTA's attempts to try to assist afflicted businesses, testifying that SEPTA employed "aggressive outreach" that was "well-planned and well-implemented." (R.R. at 215a–18a.)

5. In an eminent domain case disposed of on preliminary objections to a claim for a *de facto* taking, our scope of review is limited to determining whether the trial court's findings of fact are supported by substantial evidence in the record and whether an error of law or an abuse of discretion was committed. *Nolen v. Newtown Township,* 854 A.2d 705 (Pa. Cmwlth.2004). The trial court, as fact finder, must resolve evidentiary conflicts, and its findings will not be disturbed if supported by substantial evidence. *In re Condemnation by the Commonwealth Department of Transportation,* 827 A.2d 544 (Pa.Cmwlth.2003), *appeal denied,* 577 Pa. 737, 848 A.2d 930 (2004).

that SEPTA was granted a permit to close the 6200 block of Market Street to all traffic beginning September 2002.[6] Appellants further assert that the trial court failed to consider undisputed evidence that SEPTA's construction activities had a devastating financial impact on the business, leading to its inevitable demise.[7] Finally, Appellants argue that the trial court abused its discretion by mischaracterizing evidence regarding: (1) the twenty-percent estimate for walk-in business; (2) the inability of suppliers to deliver goods via the driveway; (3) the amount of time Appellants could not use the driveway to receive deliveries; (4) the amount of time it was necessary to park a block or two from the business; (5) the ability to access the driveway early in the morning and late at night; and (6) the complaints made to SEPTA.[8]

6. According to Appellants, this lengthy street closure and related detour, coming at a time when the Printing Company already was in precarious economic health due to SEPTA's construction activities during the previous two and a half years, was the culminating event that forced the termination of the business in May 2003.

7. During the period of SEPTA's construction, the Printing Company's gross revenue and profits suffered as follows:

| Gross Revenue | | Profits |
|---|---|---|
| 1999 $201,081.00 | 1999 pre-construction | $9,181.00 Profit |
| 2000 $141,868.00 | 2000 after construction began | $2,770.00 Loss |
| 2001 $119,060.00 | 2001 after construction began | $ 885.00 Loss |
| 2002 $ 96,989.00 | 2002 after construction began | $3,470.00 Loss |
| 2003 $ 38,359.92 | 2003 after construction began | $1,926.00 Loss |

(R.R. at 249a–50a.) Appellants assert that this evidence demonstrates a catastrophic seventy-nine percent loss of revenue following the onset of construction, with no explanation other than SEPTA's construction offered for the Printing Company's dramatic economic decline. Appellants contend that the trial court ignored the clear implication of these figures and, instead, concludes, "Appellants presented evidence that their business *slowed down* during the time of construction, however[,] they failed to demonstrate that the closing of the business was a direct and necessary consequence of the construction." (Trial ct. op. at 5, emphasis added.)

8. With respect to the walk-in business, the record contained: (1) undisputed testimonial evidence from the owner and former owner of the Printing Company regarding the walk-in business; (2) numerous photos, as well as a SEPTA construction notice, indicating the physical condition of the sidewalks causing the loss of that business, (R.R. at 254a–64a, 269a); and (3) tax records revealing the financial impact sustained as a result of the lost business. (R.R. at 249a–53a.) Appellants assert that the trial court's demand for greater proof than this constitutes an abuse of judicial discretion.

With respect to driveway access, Appellants complain that the trial court's characterization of the facts is not reasonable. Specifically, the trial court stated that the Printing Company's access to the driveway was impeded *temporarily* in 2000, whereas the undisputed testimony of record indicates that the driveway was largely inaccessible for *eight months* out of that year. (R.R. at 17a–23a.) Moreover, as described by the trial court, Appellants only *occasionally* had to park a block or two away from the business and had unobstructed access to the driveway early in the morning and late at night, whereas McElwee testified that, after the street closed, he could not get in "75 percent of the time." (R.R. at 74a.) Moreover, although the driveway might have been accessible *before* the construction crew arrived and *after* it left, Appellants remind us that the Printing Company's business hours were 8:30 a.m. to 4:30 p.m., and construction activities completely blocked the driveway during this crucial time period.

Finally, as to the lack of complaints made to SEPTA, Appellants cite Noris' uncontradicted testimony that he made numerous calls to the number specifically provided by SEPTA for complaints, but received no response. Appellants also draw attention to record exhibits of newspaper accounts of the controversy surrounding SEPTA's alleged mishandling of the construction project. (R.R. at 271a–73a.) As to the trial court's finding that Appellants failed to contact police or the

A *de facto* taking occurs when an entity clothed with the power of eminent domain[9] substantially deprives an owner of the beneficial use and enjoyment of his property. *Conroy–Prugh Glass Company v. Department of Transportation,* 456 Pa. 384, 321 A.2d 598 (1974). A property owner seeking damages for a *de facto* taking bears a heavy burden and must show the existence of exceptional circumstances to establish that he was deprived of the use and enjoyment of his property and that this deprivation was a direct and necessary consequence of actions taken by the governmental entity. *McGaffic v. Redevelopment Authority of the City of New Castle,* 120 Pa.Cmwlth. 199, 548 A.2d 653 (1988), *appeal denied,* 523 Pa. 644, 565 A.2d 1168 (1989). There is no bright line test to determine when government action shall be deemed a *de facto* taking; instead, each case must be examined and decided on its own facts. *Lehigh–Northampton Airport Authority v. WBF Associates, L.P.,* 728 A.2d 981 (Pa.Cmwlth.), *appeal denied,* 560 Pa. 751, 747 A.2d 372 (1999).

This Court has defined the right of access to one's property as the right to reasonable ingress and egress to the property. *Newman v. Department of Transportation,* 791 A.2d 1287 (Pa. Cmwlth.2002); *Elser v. Department of Transportation,* 651 A.2d 567 (Pa. Cmwlth.1994), *appeal denied,* 540 Pa. 650, 659 A.2d 988 (1995). Appellants contend that the lengthy deprivation of access to their driveway caused by SEPTA's construction activities set into motion a series of events that, *in toto,* resulted in the permanent loss of the business and Property and constituted a *de facto* taking. As support for this argument, Appellants rely on *Newman* and *McCracken v. City of Philadelphia,* 69 Pa.Cmwlth. 492, 451 A.2d 1046 (1982).

In *Newman,* this court upheld a trial court's determination that there had been a *de facto* taking of property when the property owner closed his used truck dealership due to problems associated with DOT's road construction that temporarily interfered with access to the business. We compared the situation to other cases in which roadwork was deemed to constitute a substantial and permanent impairment for which damages were recoverable under the Eminent Domain Code, *even though the construction never precluded complete access to the property. See Elser* (holding that stones dumped in the landowner's driveway deprived him of reasonable access to his property); *Department of Transportation v. Richards,* 124 Pa. Cmwlth. 432, 556 A.2d 510 (1989) (holding that reasonable access to property was denied where landowner could not access his property without scraping the bottom of his vehicle). Further, we acknowledged the difference between a construction project that adversely impacts an individual's business and one that *forces the business to close its doors. Friedman v. City of Philadelphia,* 94 Pa.Cmwlth. 572, 503 A.2d 1110 (1986). In the latter case, we held that construction activities, although temporary, could constitute permanent interference establishing a *de facto* condemnation because restoration of access was of no consequence to a business that no longer existed.

In *McCracken,* a tavern/restaurant owner alleged a *de facto* taking of his property

Parking Authority, Appellants argue that, if there was such failure, it was irrelevant to the determination of whether a *de facto* taking occurred, particularly because such complaints would have been a waste of time in light of SEPTA's permit to close the street.

9. There is no dispute that SEPTA possesses the power of eminent domain.

due to construction activities connected with an "El" project that either restricted or denied access to the premises for over two years. The property owner claimed that loss of patronage due to the construction activity made it impossible to generate sufficient income to repair and maintain the property or to operate at a profit. In upholding the determination that a *de facto* taking had occurred, we concluded that there had been much more than a temporary inconvenience to the business. Specifically, we noted that: construction activity necessitated the closing of streets adjacent to the property; street lighting had been removed in the area; heavy construction vehicles were constantly present; dirt had been dumped in front of the property; access to the bar and restaurant were severely curtailed because of building materials in front of the doors; regular customers were kept away by the construction; transient business plummeted due to a detour of traffic around the property; gross receipts decreased dramatically; and the property owner was unable to meet the costs of needed repairs, maintenance and insurance. We concluded that, while none of these circumstances individually constituted a taking, the cumulative effect, *in toto,* amounted to exceptional circumstances that substantially deprived the property owner of the use and enjoyment of his property.

Appellants maintain that, consistent with these cases, there has been a *de facto* taking here because: reasonable access to the Printing Company's driveway was denied beginning in 2000; SEPTA's construction activities resulted in a detour around the business for an extended period; heavy machinery, construction materials and dirt were constantly present; the total closing of the street completely eliminated driveway access from September 2002 until May 2003; walk-in trade disappeared; and Appellants sustained severe economic losses and the resulting demise of the Printing Company.

SEPTA does not dispute that Appellants were "temporarily inconvenienced" by the construction; however, SEPTA counters that the trial court did not err in applying the case law and, based on these particular facts, properly concluded that Appellants failed to prove a *de facto* taking. As support for this position, SEPTA distinguishes *Newman* and *McCracken* from the present situation and, like the trial court, relies on *Waldron Street Book Company v. City of Pittsburgh,* 771 A.2d 111 (Pa.Cmwlth. 2001), *Berk v. Department of Transportation,* 168 Pa.Cmwlth. 560, 651 A.2d 195 (1994), *appeal denied,* 541 Pa. 628, 661 A.2d 875 (1995), and *Truck Terminal Realty Company v. Department of Transportation,* 486 Pa. 16, 403 A.2d 986 (1979), for the proposition that limited access and temporary inconvenience caused by construction activity does not give rise to a *de facto* taking under the Eminent Domain Code. However, we are not convinced that these cases control or that *Newman* and *McCracken* are significantly distinguishable.

In *Waldron,* this court held that there was no *de facto* taking of a bookstore affected by nearby construction from a street renovation project where pedestrian and vehicular access to the business was available during business hours, a loading zone was established to enable merchants to receive deliveries and there was only a five percent loss of sales during construction. Similarly, in *Berk,* we held that there was no *de facto* taking, although the occupants were deprived of access to the main entrance of their building, where there was no structural damage to the property, the property remained tenant occupied with the owners receiving more than ninety percent of their pre-construction rental income and the property's value

increased after construction. Moreover, in *Berk,* the occupants never alleged a denial of access. In *Truck Terminal,* our supreme court held that the Eminent Domain Code does not provide damages for an impediment to access during construction in a situation where patrons suffered a temporary inconvenience by having to travel an additional fourteen miles to reach the owner's business.

In each of these cases, the owners had reasonable access to their properties during the construction projects, and none were forced to close due to the construction interference. Here, however, there was extremely limited access to the Printing Company's driveway throughout the three-year construction period, and virtually no access during business hours when supplies were delivered or shipments were picked up. Whether a particular activity deprives a property owner of the beneficial use and enjoyment of his property is dependent upon the type of use the owner has given to the property. *Genter v. Blair County Convention and Sports Facilities Authority,* 805 A.2d 51 (Pa. Cmwlth.2002), *appeal denied,* 573 Pa. 700, 825 A.2d 1263 (2003). SEPTA is correct that non-vehicular access to the Printing Company remained and that Appellants still were able to get deliveries and conduct business by arranging alternate methods of bringing in supplies. Nevertheless, *because of the nature of the business,* Appellants' need to make alternate arrangements to accommodate the lack of direct access severely curtailed productivity, which, eventually, led to the loss of clients and income and, ultimately, caused the business to fail. We conclude that this level of deprivation of use, where the ability to get raw goods to run a business is compromised for such a lengthy period, constitutes more than a "temporary inconvenience"; rather, these facts constitute

exceptional circumstances that deprive the property owner of the beneficial use and enjoyment of his property.

Moreover, we are not persuaded by SEPTA's attempt to distinguish the facts in *McCracken* and *Newman* from those presented here. For example, SEPTA points out that the disruption of business in *McCracken* was far more severe than in this case because the restaurant depended completely on walk-in customers, whereas Appellants' walk-in trade comprised only twenty percent of its business. However, in a small, struggling business, twenty percent can be the difference between remaining open and having to close, and once a business is forced to close, the disruption is total. *See Friedman.* SEPTA also notes that *Newman* concerned permanent interference with access to the property because one could never enter the property without damaging his vehicle, whereas, here, impediment to entry was not permanent because ditches in the street were covered over at night. One must wonder how SEPTA believes this helps a business that operates only during regular business hours.

SEPTA correctly points out that the trial court, as fact-finder, had the discretion to weigh the evidence and determine which was most credible, *Harborcreek Township v. Ring,* 48 Pa.Cmwlth. 542, 410 A.2d 917 (1980), and SEPTA therefore maintains that it is irrelevant whether the evidence submitted to the trial court might establish a *de facto* taking. According to SEPTA, where, as here, the testimony upon which the trial court based its determination constitutes competent evidence to support its determination, that decision must be upheld.

However, contrary to SEPTA's assertions, this matter does not turn on questions of credibility or evidentiary weight. The trial court did not reject Appellants'

evidence, but, instead, determined that it was legally insufficient to satisfy Appellants' burden of proof. We hold that the trial court erred in this regard.

Accordingly, we reverse.

### ORDER

AND NOW, this 6th day of April, 2006, the order of the Court of Common Pleas of Philadelphia County, dated February 22, 2005, is hereby reversed.

### DISSENTING OPINION BY Judge PELLEGRINI.

Based on the facts as found by the trial court, I respectfully dissent from the majority's holding that Thomas A. McElwee & Son, Inc. (Property Owner) established that they were denied sufficient access to its property necessary to establish a temporary *de facto* taking had occurred. I dissent because in reversing the trial court, the majority applies the incorrect legal standard as enunciated by our Supreme Court, and even applying that incorrect legal standard, a *de facto* taking was not proven based on the factual findings made by the trial court.

Southeastern Pennsylvania Transportation Authority (SEPTA) began construction between 61st Street and 63rd Street in January 2000 for the purpose of extending its public train service. Allegedly due to the construction project, Property Owner closed its business on May 1, 2003, with $20,000 in unpaid bills. In September 2003, Property Owner petitioned the Court of Common Pleas of Philadelphia County (trial court) for a Board of View alleging that SEPTA's construction constituted a *de facto* taking of its property and caused it financial harm which forced the business to close. SEPTA filed preliminary objections to the petition. The trial court sustained SEPTA's preliminary objections concluding that Property Owner failed to

establish a *de facto* taking. The majority reverses, based on a standard that a property owner is entitled to reasonable access during the period of construction, and based on its finding that Property Owner provided evidence that it was more than temporarily inconvenienced by the construction because "there was extremely limited access to the Printing Company's driveway throughout the three-year construction period and virtually no access during business hours when supplies were delivered or shipments were picked up." (Slip op. at 14.) I believe the majority is incorrect because it finds facts different from those of the trial court and does not apply the correct law.

The "facts" used by the majority in its opinion are not those as found by the trial court. The trial court found that while Property Owner may have been inconvenienced by the construction activity, Property Owner was not deprived of all access to its property. Specifically, it found:

After construction began on their street, Appellants assert the workers often impeded ingress and egress to their driveway by parking there during the construction. For a temporary period in 2000 Appellants could not use their driveway to receive deliveries, instead they used a hand-truck to move products from the delivery truck to the building. (John McElwee Dep. At 18). The block where the business was located was closed-off to vehicle traffic entirely during office hours starting on September 22, 2002 lasting thru May, 2003 and occasionally Appellants had to park a block or two from the business. Appellants had unobstructed access to the driveway early in the morning and late at night. (John McElwee Dep. At 14). Although Appellants claim "no supplier could deliver goods to Plaintiff's business", the Record belies this assertion.

Appellant John McElwee testified that, at most, there was one example of a supplier who may have come out to the business but could not make the delivery; the supplier returned the next day. (John McElwee Dep. At 79). Appellants claim they lost customers because they could not meet deadlines due to the difficulty in getting supplies, however there was never a time when a delivery could not be made. (John McElwee Dep. At 78–79, DeFlabia Dep. At 22). Appellants designated one employee to call SEPTA and complain, which, it is alleged, he did dozens of times. Appellants however never filed a formal, written complaint or attended any of the community programs set up by SEPTA to deal with business-related complaints. Appellants claim they did speak with Michael Tucker, a business mitigation and development consultant for SEPTA, but their complaints were ignored. Appellants never called the police department or the Philadelphia Parking Authority about the illegally parked cars and trucks that were blocking their driveway. (Thomas McElwee Dep. At 79–80).

(Trial court's April 5, 2005 opinion at 2–3.) Based on these facts, the trial court established that there was not substantial interference with reasonable access to the property to constitute a *de facto* taking, even if that was the correct standard to apply.

That leads to the legal standard that the majority applies—that there is a taking where a property has been denied the right to reasonable ingress and egress to the property. Even though we have applied that standard in our more recent cases,[1] it is not accord with the standard enunciated by our Supreme Court in *Truck Terminal Realty Company v. De-* *partment of Transportation,* 486 Pa. 16, 403 A.2d 986 (1979). In that case, a property owner alleged a *de facto* taking had occurred when it temporarily lost access to its property during construction because patrons had to travel an additional 14 miles to reach the owner's business. In concluding that a taking had not occurred, our Supreme Court held that the Eminent Domain Code did not provide damages for the temporary loss of access to property, and no such claim existed at common law stating:

> The cases almost uniformly hold that damages cannot be recovered for inconvenience in the transition of business . . . caused by the work of making a public improvement; that this temporary inconvenience, and all losses therefrom, must be suffered, for the law permits a recovery only of the permanent depreciation in the value of property taken or injured . . . such depreciation to be judged by the effect of the improvement when completed. (Citation omitted.) (Quoting from *Iron City Auto. Co. v. Pittsburgh,* 253 Pa. 478 at 493, 98 A. 679 at 684 (1916)).

*Id.* at 21, 403 A.2d at 988. It reasoned that a taking had not occurred where temporary access was denied because:

> The actions of the governmental agency, . . ., must fall into two distinct categories: the exercise of eminent domain power, which requires just compensation; and the valid exercise of the police power, not requiring compensation. Temporary interference with road access falls under the noncompensable, exercise of the police power necessary to effectuate public improvement, unless the alleged interference was accomplished in an arbitrary or unreasonable

---

1. *See e.g. Newman v. Dept. of Transportation,* 791 A.2d 1287 (Pa.Cmwlth.2002); *Elser v.* *Department of Transportation,* 651 A.2d 567 (Pa.Cmwlth.1994).

manner. (Citations and footnotes omitted.)

This holding was recently reiterated by our Supreme Court in *Sienkiewicz v. Department. of Transportation,* 584 Pa. 270, 883 A.2d 494, 502 (2005), where it stated:

[A] claim of impact based upon diversion of traffic flow during the period of actual construction, the law is that such impact is also non-compensable, absent extraordinary circumstances not present here. See *Truck Terminal Realty Co. v. PennDOT,* 486 Pa. 16, 23, 403 A.2d 986, 989 (1979). ("Temporary interference with road access falls under the noncompensable, exercise of the police power necessary to effectuate public improvement, unless the alleged interference was accomplished in an arbitrary or unreasonable manner.")

The most favorable interpretation in favor of a *de facto* taking occurring that can be gleaned from *Terminal Freight* and *Sienkiewicz* is that when access is denied but not required by construction necessities, such interference is arbitrary and unreasonable and a taking occurs.

The very narrow standard upon which a taking can be found is based upon recognition of the fact that the privilege of receiving the benefits of life within a municipality or other governmental jurisdiction carries with it certain attendant burdens, including the obligation to suffer the inevitable inconvenience associated with public works construction without compensation. 2A Julius L. Sackman, Nichols' The Law of Eminent Domain § 6.09[2] (rev.3d ed.1995):

Consequential damages to adjoining property owners in the way of diminution of business while construction is in progress does not constitute a taking of property for which compensation must be made under the Fifth Amendment of the Constitution. Such losses are *damnum absque injuria* [a loss or damage without injury] and, unfortunately, must be borne by the individual as part of the price that he or she pays for being a member of organized society and living in an urban community. *Nichols'* (quoting *Meyers v. District of Columbia,* 17 F.R.D. 216, 217 (D.D.C.1955) and citing cases from 13 other states).

To make the state or a local public agency liable for damages caused by all public construction would place an impossible burden upon the taxpayers and would reduce the number of projects for the common good that increase road safety and would hamper the construction of public projects. *See Rubano v. Department of Transportation,* 656 So.2d 1264 (Fla.1995); *Berman Corporation v. State ex rel. State Highway Commission,* 24 Or.App. 813, 547 P.2d 192 (1976); *Langley Shopping Center, Inc. v. State Roads Commission,* 213 Md. 230, 131 A.2d 690, 693 (1957).

Accordingly, because Property Owner failed to prove that even reasonable access was denied, let alone that it was denied all access which was not necessary due to construction necessities, I would affirm the trial court.

Judge COHN JUBELIRER joins this dissenting opinion.