In re the Petition of Robert F. FLOW-ERS and Martha Flowers, His Wife; for the Appointment of Viewers to Ascertain Damages to their Land in Unity Township, Westmoreland County, Pennsylvania, by Reason of the Use of and Location of the Glide Path and Landing Approach of the West-moreland County Airport Authority Runway.

Westmoreland County Airport Authority, Appellant.

Commonwealth Court of Pennsylvania.

Argued June 17, 1999.

Decided July 16, 1999.

Donald J. Snyder, Jr., Latrobe, for appellant.

James A. Wells, Greensburg, for appellees.

Before PELLEGRINI, J., FLAHERTY, J., and NARICK, Senior Judge.

PELLEGRINI, Judge.

The Westmoreland County Airport Authority (Authority) appeals from an order of the Court of Common Pleas of Westmoreland County (trial court) dismissing its preliminary objections to Robert F. Flowers' and Martha Flowers' (collectively, Landowners) Petition for Appointment of a Board of Viewers (Petition) alleging that the Authority's operation of Latrobe Airport with regard to their property constituted a *de facto* taking under Section 502(e) of the Eminent Domain Code (Code).[1]

In 1960, Landowners purchased their property located at 1502 Beech Drive in Unity Township, Westmoreland County (property). In the vicinity of their property was and continues to be Latrobe Airport. The Authority owns Latrobe Airport and is responsible for its maintenance and operation. Latrobe Airport is composed of two runways: Runway 5/23[2] and Runway 3/21. In 1968, Runway 5/23 measured 5,000 feet and in May 1986, it was extended to 7,001 feet in a southwesterly direction. The centerline extension of Runway 5/23 is 167.08 feet from Landowners' property line and 223.16 feet from their house.

In February 1996, Landowners filed the Petition asserting that the Authority had effectuated a *de facto* taking of their property. In their Petition, Landowners alleged that the Authority had deprived them of the beneficial use and enjoyment of the air space immediately above their property when it allowed increased usage of Runway 5/23. They also alleged that they suffered property damage as a result of the increased use. The Authority filed preliminary objections in the nature of a demurrer asserting, *inter alia*, that Landowners' Petition was time barred. A hearing was then held before the trial court.

Before the trial court, Landowners[3] testified that at the time they purchased their property in 1960, there was neither any significant amount of aircraft flying over their house nor was there any problem with respect to noise emanating from those aircraft. They stated that they noticed aircraft flying over their house in 1975, but the noise did not become bothersome until approximately 1992 or 1993 when they noticed a gradual increase in the amount of noise from aircraft at Latrobe Airport. Landowners indicated that they believed the noise had increased because Latrobe Airport began servicing a greater number of larger aircraft, which they identified as jets. They testified that the noise was so loud that it prohibited them from engaging in telephone or face-to-face conversations both inside and outside of their house, watching television or listening to the radio. Landowners further testified that the noise from the aircraft created vibrations two to four times per month that caused their house to "shake, rattle and roll" and to make rumbling sounds. They also indicated that at night, the lights from these aircraft would often shine through their bedroom windows and disturb their sleep. Landowners further indicated that they

1. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–502(e). Section 502(e) of the Code provides:
   If there has been a compensable injury suffered and no declaration of taking thereof has been filed, a condemnee may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) of this section, setting forth such injury.

2. "5/23" designates the magnetic heading of the runway, i.e., 50 degrees to the northeast by 230 degrees to the southwest. Runway 5/23 was constructed according to these directional headings in order to match, as closely as possible, prevailing winds from the southwest.

3. Robert F. Flowers and Martha Flowers testified to essentially the same facts during the proceedings before the trial court. For purposes of this opinion, the essence of their testimony will be consolidated.

had to clean their back porch and car windows more often because it "gets black from ... airplane fuel."[4]

The Authority presented the testimony of Eugene Lakin (Lakin), executive director for the Authority, who testified that Latrobe Airport was classified by the Federal Aviation Administration as a non-hub primary commercial service airport, i.e., the airport had at least 10,000 passenger enplanements each year. Lakin stated that there were approximately 233 aircraft based at Latrobe Airport. He further stated that the airport had grown dramatically within the past ten years due to the number of people using the airport, Runway 5/23's extension and the increased number of services offered at the terminal; however, the number of "operations", i.e., either a landing or a takeoff, had decreased. Lakin conceded that the amount of aircraft jet activity had increased over the same time period.

Charles W. Green (Green), chief of air traffic control at Latrobe Airport, also testified on behalf of the Authority. He stated that Runway 5/23 was the most used runway because of its prevailing winds from the southwest. With respect to the total number of operations for aircraft at Latrobe Airport, Green testified as follows:

| Year | Total Operations |
|------|------------------|
| 1969 | 26,350 |
| 1979 | 75,828 |
| 1989 | 55,889 |
| 1997 | 48,671 [5] |

He further testified that of all the operations listed above, between 85% and 90% occurred on Runway 5/23, such that at the least, aircraft would take off in the direction of Landowners' house. Green stated that the decline in operations at Latrobe Airport was a reflection of the increasing costs of general aviation and a decline in the number of people attempting to obtain or maintain a pilot's license. With respect to air carrier operations,[6] Green indicated that those figures had increased over the years.[7]

Based upon the testimony and the evidence presented, the trial court held that Landowners had sustained their burden to show that the Authority's activities at Latrobe Airport deprived them of the beneficial use and enjoyment of their property and constituted a *de facto* taking. Regarding the Authority's claim that Landowners' Petition was time barred, the trial court held that the 21–year statute of limitations of Section 42 Pa.C.S. § 5530(a)(3) was applicable to Landowners' Petition because the Authority's actions did not deprive Landowners of the beneficial use and enjoyment of their property until "four to six years" before they

4. Landowners testified that they believed the substance was jet fuel because of its location on their property and the path of the aircraft that traveled over their house.

5. The total number of jet operations in 1997 was 1,218. Regarding large charter jets, Green testified that total operations were 294, 147 of which would have been in the area of Landowners' property. However, the parties stipulated that between 1992 and 1996, the approximate total number of aircraft operations from Latrobe Airport in the direction of Landowners' property, on an annual basis, was as follows:

| Year | Total Annual Operations |
|------|--------------------------|
| 1992 | 31,800 |
| 1993 | 29,500 |
| 1994 | 24,860 |
| 1995 | 23,700 |
| 1996 | 23,300 |

6. Green testified that, "[a]n air carrier operation by the FAA, it depends or pertains to certain type of aircraft as an air carrier. There's a list of about twenty-four of them [which] ... include the DC9, the DC8, the 727, 737, 747, 757, and so on.... They are what the FAA calls an air carrier operation." Green further testified that the total number of air carrier operations at Latrobe Airport had increased from a total of 0 in 1982 to a total of 134 in 1996.

7. The Authority also presented the testimony of Edward Nasuti, a professional engineer and president of Lee Simpson Associates, Inc., a civil consulting engineering firm that provided various services to the Authority. He testified regarding the distance of Runway 5/23's "glide slope", i.e., the actual surface an airplane uses to approach Runway 5/23, in relation to Landowners' property.

filed their Petition, i.e., approximately 1990 to 1992. This appeal by the Authority followed.[8]

Not disputing the trial court's finding that Landowners lost the beneficial use and enjoyment of their property as a result of the activities at Latrobe Airport, the Authority contends that the trial court erred in applying the 21–year statute of limitations of 42 Pa.C.S. § 5530(a)(3) rather than the five-year statute of limitations of 42 Pa.C.S. § 5526(4). The five-year statute of limitations of 42 Pa.C.S. § 5526(4) applies if "property has been *injured* but no part thereof has been taken", while the 21–year statute of limitations of 42 Pa.C.S. § 5530(a)(3) applies if the property "has been *taken* and the condemnor has not made payment in accordance with section 407(a) or (b)"[9] of the Code. It argues that Landowners' property was merely "injured" and not taken as a result of the aircraft activity at Latrobe Airport, so that their Petition is governed by the five-year statute of limitations.

The applicable time limitation is then determined by whether Landowners' property was "taken" by the Authority. In Pennsylvania, ownership of air space is governed by Section 5501 of the Aviation Code, 74 Pa.C.S. § 5501, which provides in relevant part:

(a) **General rule.**—The ownership of the space over and above the lands ... of this Commonwealth is declared to be vested in the owner of the surface beneath, but the ownership extends only so far as is necessary to the enjoyment of the use of the surface without interference and is subject to the right of pas-

sage or flight of aircraft. (Emphasis in original).

Where the nature of the aircraft flights over private property are so intrusive that an air easement is acquired, Section 5920 of the Aviation Code, 74 Pa.C.S. § 5920, provides, in relevant part:

[T]he municipality or municipal authority owning the airport or served by it, *may acquire by purchase, grant or condemnation,* in the manner provided by law under which municipalities are authorized to acquire real property for public purposes, such air right, aviation easement or other estate or interest in the property ... in question as may be necessary to effectuate the purpose of this subchapter. In the case of ... *the acquisition thereof by the power of eminent domain, the municipality ... exercising the power shall [pay for] ... the taking[.]* (Emphasis added).

■ Aircraft flights over private property result in a *de facto* taking of the property when their frequency and noise level result in owners being deprived of the beneficial use and enjoyment of their property such that they are no longer in possession of their property. *Griggs v. County of Allegheny,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); *Erie Municipal Airport Authority v. Agostini,* 127 Pa. Cmwlth. 360, 561 A.2d 1281 (1989), *petition for allowance of appeal denied,* 525 Pa. 586, 575 A.2d 116 (1990) *and* 525 Pa. 588, 575 A.2d 118 (1990); *In re Condemnation by the County of Allegheny,* 63 Pa.Cmwlth. 99, 437 A.2d 795 (1981); *see also Commonwealth v. Rogers,* 430 Pa.Super. 253, 634 A.2d 245 (1993) (flights which interfere

**8.** Our scope of review of a trial court's ruling on preliminary objections to a petition for appointment of a board of viewers is limited to a determination of whether an error of law was committed or whether necessary findings of fact are supported by competent evidence. *Domiano v. Department of Environmental Resources,* 713 A.2d 713 (Pa.Cmwlth.1998). In all cases alleging a *de facto* taking, the burden of proof lies with the property owners to establish that a *de facto* taking has, in fact, occurred. *Riedel v. County of Allegheny,* 159 Pa.Cmwlth. 583, 633 A.2d 1325 (1993). Each

claim for a *de facto* taking is contingent upon the unique factual matrix of the case. *Darlington v. County of Chester,* 147 Pa.Cmwlth. 177, 607 A.2d 315, *petition for allowance of appeal denied,* 531 Pa. 657, 613 A.2d 562 (1992).

**9.** Section 407(a) relates to payment when the condemnee tenders possession of the property to condemnor. Section 407(b) relates to condemnee's ability to compel condemnor's tender of payment for the property.

with beneficial use and enjoyment of land beneath air space represents partial taking, creating right to compensation); *Lando v. Urban Redevelopment Authority, Inc.*, 49 Pa.Cmwlth. 566, 411 A.2d 1274, 1276 (1980) ("[i]f a condemnor's acts do not constitute an actual taking, but rather a substantial deprivation of a landowner's beneficial use and enjoyment of his property, the deprivation constitutes a compensable injury and a *de facto* taking or condemnation.")

■ Because the Authority does not challenge that Landowners were deprived of the beneficial use and enjoyment of their property, by definition, a *de facto* taking of an air easement over Landowners' property occurred, and the 21–year statute of limitation of 42 Pa.C.S. § 5530(a)(3) applies.[10] *Captline v. County of Allegheny*, 662 A.2d 691 (Pa.Cmwlth. 1995); *Appeal of Krauss*, 151 Pa.Cmwlth. 619, 618 A.2d 1070 (1992). Because Landowners filed their Petition in February 1996 for events that took place in approximately 1992 or 1993, their claim was well within the 21–year statute of limitation.[11]

Accordingly, the order of the trial court is affirmed.

### *ORDER*

AND NOW, this 16th day of July, 1999, the order of the Court of Common Pleas of Westmoreland County at No. 1308 of 1996 dated October 14, 1998, is affirmed.

---

10. If we had held that the five-year statute of limitations contained in 42 Pa.C.S. § 5526(4) applied, we would have remanded the case to the trial court for a more definitive finding of when within the "four to six" years the *de facto* taking actually occurred.

11. The Authority also contends that the trial court erred in not finding that Landowners' Petition was time barred because their property was affected by the operation of Runway ⅚₃ when it was constructed in 1968 so that they were required to file their Petition within 21 years from 1968. Contrary to the Authority's assertion, the statute of limitations does not begin to run until a cause of action accrues. *Captline*. In this case, Landowners' cause of action did not accrue until there was a substantial deprivation in the beneficial use and enjoyment of their property, which did not occur until approximately 1992 or 1993 when they began to experience problems because of Runway 5/23's activities. Irrespective of the definitive year, Landowners filed their Petition in February 1996, well within the 21–year statute of limitations.