IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wladyslaw Gabrys and       :
Natalia Gabrys              :
                             :
          v.             :
                             :
Pocono Mountains Municipal    :
Airport Authority,          :   No. 1485 C.D. 2017
             Appellant    :   Argued: September 18, 2018

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE ROBERT SIMPSON, Judge (P.)
                HONORABLE ANNE E. COVEY, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                          FILED: October 15, 2018

The Pocono Mountains Municipal Airport Authority (Airport Authority) appeals from the Monroe County Common Pleas Court's (trial court) September 14, 2017 order overruling the Airport Authority's preliminary objections (Preliminary Objections) to Wladyslaw and Natalia Gabrys' (collectively, Gabrys) Petition for Appointment of Viewers (Petition). The Airport Authority presents four issues for this Court's review: (1) whether the trial court's factual findings are supported by the record evidence; (2) whether the Gabrys presented sufficient *prima facie* evidence of a de facto taking; (3) whether the Airport Authority presented sufficient evidence to rebut the de facto taking; and, (4) whether the trial court erred by failing to properly articulate the extent of the taking. After review, we affirm.

## Background

The Gabrys purchased a home at 384 Sidney Avenue, Pocono Summit, Pennsylvania (Property) on December 14, 2001. The Property is located at the end of a quiet cul-de-sac and has been the Gabrys' primary residence since they purchased the Property. A train track is located behind the Property to the east of the cul-de-sac, and beyond that is the Pocono Mountains Municipal Airport (Airport). The Airport consists of two runways laid out in a cross-like configuration with Runway 23 at the northern point of the cross, Runway 31 at the eastern point, Runway 5 at the southern point and Runway 13 at the western point of the cross. The Airport runways were constructed so that landings and takeoffs could be completed in wind from any direction. Planes landing on or taking off from Runway 13 fly near the Property as they approach or depart the runway.

In 2010, the Airport was expanded. In the 2010 expansion, Runway 13/31 was lengthened from 3,950 to 5,001 feet, and widened by 60 to 75 feet. The runway was lengthened in order to support business transportation and military flights serving the nearby Tobyhanna Army Depot. The longer runway permits fixed-wing military aircraft to use the Airport and allows larger aircraft and small commercial jets to access the Airport. Runway 13 is primarily used for landings. Runway 31 is the active runway for aircraft taking off to the north. Runway 13 is occasionally used for takeoffs when there are winds from the south, which generally signals bad weather conditions.

The Property is not directly in the flight path of planes landing and taking off from Runway 13, but is immediately next to it. Since the 2010 Runway 13/31 expansion, aircraft have been flying at low altitudes over or near the Property more often, which has caused Wladyslaw Gabrys great concern. He testified that the number of flights varies from day-to-day, but it is not uncommon for 20 to 70 flights

2

to travel over or in the near vicinity of the Property daily. These flights occur in clear weather from 6:30 a.m. until 11:30 p.m.

There were 212 flights over or in the vicinity of the Property from the Airport in July 2017. Helicopters also regularly fly to and from the Airport over or near the Property. Helicopter instructors and their students fly the helicopters up and down and side-to-side in the vicinity of the Property for half-hour periods. A two-engine jet regularly lands on Runway 13 at 2:30 a.m. and at other times in the middle of the night. During the Pocono Raceway race weekends, twelve to twenty-five jets land near the Property.

The Federal Aviation Administration (FAA) Regulations provide that noise generated by aircraft taking off and landing at an airport is compatible with the use of residential property if yearly day/night average sound levels on that property are below 65 decibels. A final design report for the Airport's 2010 runway expansion project was prepared by McFarland-Johnson in October 2008. The McFarland-Johnson Report stated:

> A noise analysis was completed in the 2002 *Master Plan Update.* This analysis was completed with the proposed Runway 13 extension, thus the total runway length was 5,000 feet. As shown on the enclosed Land Use figure, the 65 dBA DNL noise contour stays on airport property except for small areas around Runway Ends 13 and 31. The non-airport property that the 65 DNL contour extends over is undeveloped and wooded; noise sensitive areas are not included inside of the 65 DNL contour. Therefore, the proposed project will not have significant noise impacts.

Airport Authority Ex. 3, McFarland-Johnson Report, FAA Eastern Region Airports Division.

An April 2002 Land Use Plan prepared by McFarland-Johnson showed noise contour lines around the area of Runway 13's proposed extension. Location No. 1 marked on the Land Use Plan map is the Property's approximate location. The

3

average noise level shown at Location No. 1 was 80 decibels. FAA Regulations do not allow an aircraft to turn from the runway heading as it lifts off from Runway 13 until the aircraft is at least five hundred feet above the ground. Aircraft are required to maintain the runway heading until they have crossed Route 380.

## Facts

On August 22, 2016, the Gabrys filed the Petition pursuant to Section 502(c) of the Eminent Domain Code,[1] seeking just compensation for the Airport Authority's de facto taking of the Property. The Airport Authority filed an answer to the Petition and the Preliminary Objections pursuant to Section 504(d) of the Eminent Domain Code.[2] The trial court held a hearing on July 20, 2017. On September 14, 2017, the trial court determined that the Airport Authority had caused a de facto taking of the Property and overruled the Preliminary Objections. The Airport Authority appealed to this Court.[3]

## Discussion

The Airport Authority first argues that the trial court's factual findings are not supported by the record evidence. Specifically, the Airport Authority challenges five of the trial court's factual findings which it asserts are not supported by record evidence: (1) "[a] two[-]engine jet 'regularly' lands on runway 13 at 2:30a.m.[;]" (2) "during Pocono Raceway weekends, twelve to twenty[-]five jets

---

[1] 26 Pa.C.S. § 502(c) (relating to "[c]ondemnation where no declaration of taking has been filed").

[2] 26 Pa.C.S. § 504(d) (relating to preliminary objections).

[3] "In eminent domain proceedings, where a trial court has either sustained or overruled preliminary objections to a declaration of taking, this Court's scope of review is limited to determining whether the trial court abused its discretion or committed an error of law." *In re Condemnation by Cty. of Allegheny*, 861 A.2d 387, 391 n.6 (Pa. Cmwlth. 2004).

'land near [the Property][;]'" (3) "lights on the airport for jets landing in the middle of the night 'light up the area like daylight[;]'" (4) "the [Property] is 'within 200 feet of the maintained end of the runway[;]'" and (5) "aircraft fly low enough they 'sometimes touch branches on the [Property][.]'" Authority Br. at 16, 17, 18.[4]

> Initially, the Pennsylvania Supreme Court has held:

> As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy.

*Dep't of Transp., Bureau of Driver Licensing v. O'Connell*, 555 A.2d 873, 875 (Pa. Cmwlth. 1989). "Substantial evidence is that evidence which would be accepted by a reasonable person to support the finding." *Palm Corp. v. Dep't of Transp.*, 688 A.2d 251, 253 n.8 (Pa. Cmwlth. 1997). A homeowner's credible testimony constitutes substantial evidence. *See In re Condemnation by Cty. of Allegheny*, 437 A.2d 795 (Pa. Cmwlth. 1981).

> The first three challenged findings are contained in Finding of Fact 14, which reads:

> A two[-]engine jet regularly lands on Runway 13 at 2:30 a.m. and at other times in the middle of the night, disturbing the Gabrys'[] sleep. During the Pocono Raceway race weekends, twelve to twenty[-]five jets land near their house. Lights on the airport for jets landing in the middle of the night light up the area like daylight.

---

[4] These findings are portions of Findings of Fact 11 and 14, and a statement within the discussion.

5

Trial Ct. September 14, 2017 Op. at 3-4. With respect to the first portion of that finding of fact, Wladyslaw Gabrys testified:[5]

> A. [] I wake up today in the morning 12:11, after midnight, big jet, two-engine jet fly over my house. I have a note. Before we go into the court for house -- you have a number flight and time what this plane, about 25 feet, and level the tree, fly in the house.
>
> Q. So that was at 12:11 this morning a two-engine jet --
>
> A. Yes. A lot of them 2:30 in the morning, 3:30 in the morning. . . .

Reproduced Record (R.R.) at 35a-36a. The Gabrys' daughter, Isabella, related that she has "work in the morning, and [she] get[s] woken up like 3:00 in the morning by a jet airplane." R.R. at 56a. Natalia Gabrys declared that the night before the hearing, planes fly "[m]aybe 4:00 o'clock . . . [f]ly 12:00, 11:00." R.R. at 69a.

Relative to the Pocono Raceway weekends, when asked, "are there any other aircrafts other than airplanes," Wladyslaw Gabrys responded:

> Oh, yeah, a lot of jets, two-engine, big jets. Most of them racing in the Big Pocono Winston 500. Some of them park right by runway from 611. That's what I counted from. That's what I see. That was 12. Most of them 25, what I see it. Everyone is parking from 611 close to the airport, which is the runway to 611.

R.R. at 32a. Finally, concerning the lights, Airport Authority board member George Strunk (Strunk) testified that the "airport is open all night" and, although the runways do not remain lit all night, when an airplane approaches, the pilot "click[s] [] three times for low[-]intensity, five times for medium, and seven times in 3 seconds for high[-]intensity, and then the lights will come up."[6] R.R. at 123a. Clearly, the above

---

[5] The Gabrys moved from Poland to America in "August 1989"; hence, the broken English in their testimony. R.R. at 26a.

[6] There is no further explanation in the record regarding the clicking.

6

testimony is "evidence which would be accepted by a reasonable person to support" Finding of Fact 14. *Palm Corp.*, 688 A.2d at 253 n.8.

The next challenged finding of fact is not a finding of fact, but a portion of a paragraph within the trial court's "Discussion" that reads:

> Wladyslaw Gabrys, his wife Natalia Gabrys and their daughter, Isabella Gabrys testified about how the 2010 airport expansion affected their lives and the use of their property. While their home is not directly in the path of planes taking off and landing on Runway 13, **it is within 200 feet of the maintained end of the runway**. *Respondent's Exhibit 4.* Planes landing on Runway 13 or taking off from there are travelling past or over the [Property].

Trial Ct. September 14, 2017 Op. at 7 (emphasis added). Although the trial court cites to the Airport Authority's Exhibit 4 in the Discussion section of its September 14, 2017 opinion, as quoted above, it cites to the Gabrys' Exhibit 3 in its 1925(a) opinion.

The Airport Authority asserts that its

> Exhibit 4 . . . shows a pre-expansion aerial view and does not illustrate the maintained end of Runway 13. In its 1925(a) opinion, the trial court justifies its finding by citing a 'Survey Work Limits' map contained in Gabrys[]' Exhibit 3, which is [the Airport Authority's] Final Design Report. . . . **It is respectfully submitted that the trial court misread this map**. The line that the trial court interprets as the 'maintained end of the runway' at approximately 1/2 inch from Gabrys[]' home is actually the 'survey limit' line. This line marks the limit of the survey work, not the maintained end of the runway, which is actually much farther from Gabrys[]' home.

Airport Authority Br. at 18 (emphasis added). Because the Airport Authority does not state the correct distance between the Property and the maintained end of the

runway, nor explains how the trial court's misreading of the map affected the trial court's ruling, this Court concludes the error, if any, was harmless.[7]

The last challenged finding is a portion of Finding of Fact 11, which reads:

> Since the time Runway 13/31 was expanded to 5,000 feet, aircraft have been flying at low altitude over or near the Gabrys['] house more often, **sometimes touching branches on the Gabrys['] [P]roperty**. This has caused Wladyslaw Gabrys great concern. He testified that the number of flights varies from day[-]to[-]day, but it is not uncommon for 20 to 70 flights to occur daily over or in the near vicinity of his property. These flights occur all day in clear weather, from 6:30 a.m. until 11:30 p.m.

Trial Ct. September 14, 2017 Op. at 3 (emphasis added). The Airport Authority contends:

> [T]he trial court's chief finding of fact with respect to proximity of flight, namely that [ ] aircraft fly low enough that they 'sometimes touch branches on the Gabrys[]' [P]roperty' [R.R. at 137a], a finding upon which it concluded that a taking of Gabrys[]' [P]roperty had occurred, was erroneous in that it was based on patently incredible testimony offered by the Gabrys[]. It is or ought to be common knowledge that aircraft cannot routinely fly into tree branches without corresponding and equally routine fiery fatal crashes, of which there was no evidence or mention.

Airport Authority Br. at 18.

First, the trial court made 20 findings of fact and the challenged statement is but a portion of only one of them. Thus, the statement is hardly a "chief finding of fact . . . upon which it concluded that a taking of Gabrys[]' [P]roperty had

---

[7] The trial court's determination of a de facto taking was based on the effect the airport expansion had on the Property, rather than the Airport's distance from the Property. *See* Trial Ct. September 14, 2017 Op. at 8 ("The Gabrys[] have established a substantial deprivation of the beneficial use of their residential property.").

occurred[.]" *Id.* Second, Wladyslaw Gabrys did testify that "I wake up today in the morning 12:11, after midnight, big jet, two-engine jet fly over my house . . . about 25 feet, and level the tree, fly in the house." R.R. at 35a. Whether it was an exaggeration or a language problem was at the factfinder's discretion to determine. "[T]he weight and credibility of testimonial evidence is for the trial court as factfinder, and, in that role, the trial court is free to credit or reject the testimony of any witness." *Lehigh-Northampton Airport Auth. v. WBF Assocs., L.P.*, 728 A.2d 981, 991 (Pa. Cmwlth. 1999). Notwithstanding, this Court concludes the error, if any, was harmless.[8]

Because "[a]s a reviewing court, we are bound by those facts which we determine to be supported by the evidence . . . [and] [the Airport Authority] has not challenged [any other] factual findings, they are conclusive and may not be disregarded." *Polinsky v. Dep't of Transp.*, 569 A.2d 425, 428 n.2 (Pa. Cmwlth. 1990). Accordingly, the trial court did not abuse its discretion or err by making or relying on its findings of facts.

The Airport Authority next argues that the Gabrys did not present *prima facie* evidence of a de facto taking. "A landowner alleging a de facto taking is under a heavy burden to establish that such a taking has occurred." *McElwee v. Se. Pa. Transp. Auth.*, 948 A.2d 762, 771 (Pa. Cmwlth. 2008) (quoting *Miller & Son Paving v. Plumstead Twp.,* 717 A.2d 483, 485 (Pa. 1998)). "The appellate role in reviewing trial court determinations concerning the sufficiency of the evidence to make out a *prima facie* case necessarily entails evaluating whether pertinent facts are, or are not, clearly established as of record[.]" *Id.* at 774.

---

[8] If this Court were to strike that portion of Finding of Fact 11, it would not change this Court's conclusion that "sufficient evidence exists in the record which is adequate to support the finding found by the trial court." *O'Connell*, 555 A.2d at 875.

> We begin our analysis with the well-established principle that a de facto taking occurs when an entity, clothed with the power of eminent domain, exercises that power causing damages to the property owner which are the immediate, necessary and unavoidable consequences of that exercise. To find a de facto taking, there must be exceptional circumstances which have substantially deprived the property owner of the use and enjoyment of his or her property.

*In re Prop. Along Pine Rd. in Earl Twp.*, 743 A.2d 990, 993 (Pa. Cmwlth. 1999) (citation omitted).

The Pennsylvania Supreme Court has long held: "It is clear as crystal under the authority of [*U.S.*] *v. Causby*[, 328 U.S. 256 (1946),] that flights over private land which are so low and so frequent as to be a direct and immediate interference with the enjoyment and the use of the land amount to a 'taking'." *Gardner v. Cty. of Allegheny*, 114 A.2d 491, 505 (Pa. Cmwlth. 1955). Further, "this court has never limited a de facto taking of an aircraft easement to the factual situation of direct overflights[.]" *In re Harr*, 507 A.2d 899, 902 (Pa. Cmwlth. 1986) (quoting *City of Phila. v. Keyser,* 407 A.2d 55, 56 (Pa. Cmwlth. 1979)).

In *Harr*, this Court ruled:

> The trial court made specific factual findings relating to the interference with the homeowners' use and enjoyment of their properties, as follows: The aircraft passing over created noise to the extent that conversations by occupants over the telephone were interrupted; television sound could not be heard; windows and pipes rattled; landing lights shone into a bedroom; cattle were frightened; petroleum film settled on the homeowners' lawn; an aircraft had crashed 200 yards nearby; and the FAA report indicated that aircraft sound levels on the properties were unacceptable. The combination of evidence outlined above, based on testimony which the trial judge found credible - together with the undisputed facts regarding the distance and number of overflights - is sufficient to support the trial judge's ultimate finding that the airport's operations

substantially interfered with the homeowners' use and enjoyment of their properties.

*Id.* at 902.

Here, the trial court made the following specific findings of fact which the Airport Authority did not challenge: "The Gabrys['] home is not directly in the flight path of planes landing and taking off from Runway 13, but it is immediately next to it[;]" "[h]elicopters regularly fly from the airport over or near the Gabrys['] [P]roperty[,] [s]ometimes [flying] low over the property, frightening the Gabrys[] and their visitors[, and] . . . other times, helicopter instructors and their students fly the helicopters upside down and side[-]to[-]side in the vicinity of the Gabrys['] [P]roperty for half[-]hour periods[;]" "[w]hen aircraft fly over the Gabrys'[] house their windows shake[,] [t]heir yard smells like aviation exhaust[, and] [t]hey are unable to use their yard for outdoor cooking and entertaining because of the loud and frequent noise of the helicopters and the aircraft using Runway 13/31." Findings of Fact 10, 13, 15. The trial court opined:

> The Gabrys['] property is located approximately 400 feet from Runway 13.
>
> . . . [T]he Gabrys['] house is next to the flight path.
>
> . . . . Planes landing on Runway 13 or taking off from there are travelling past or over the Gabrys['] [P]roperty.
>
> . . . . The noise of jets landing next to their property in the middle of the night interfered with their sleep, and during the day the noise of aircraft landing or taking off often prevented them from conversing outside. The odor of aviation exhaust affected their ability to use their yard. These intrusions were not an occasional problem; in July the Gabrys[] counted 212 flights over the[] [P]roperty. It is not uncommon for there to be 20 to 70 flights per day over or adjacent to their property.

Trial Ct. September 14, 2017 Op. at 7-8.

11

"The combination of evidence outlined above, based on testimony which the trial judge found credible . . . is sufficient to support the trial judge's ultimate finding that the airport's operations substantially interfered with the homeowner['s] use and enjoyment of their [P]ropert[y]." *Harr*, 507 A.2d at 902. Accordingly, this Court concludes that the Gabrys presented *prima facie* evidence of a de facto taking.

The Airport Authority next argues that it presented sufficient evidence to rebut the de facto taking. Specifically, the Airport Authority contends that because the trial court articulated no basis for rejecting the Airport Authority's expert witness and noise analysis, the trial court abused its discretion and erred as a matter of law in finding that a de facto taking had occurred.

> [The Airport Authority] maintains that the trial court erred in accepting the testimony of [the Gabrys'] witnesses despite conflicts in the record; however, we recognize that the weight and credibility of testimonial evidence is for the trial court as factfinder, and, in that role, the trial court is free to credit or reject the testimony of any witness.

*Lehigh-Northampton Airport Auth.,* 728 A.2d at 991.

Moreover, the trial court explained:

> The [Airport Authority] did not refute the Gabrys[]' testimony about the direct effect the use of the expanded runway has had on their [P]roperty by a witness with personal observation. [The Airport Authority] relies upon a study that was done in 2002 of noise levels that were predicted if the runway was expanded. That study predicted the average decibel level of airport-generated noise at the Gabrys['] home as 60.5 decibels. The [FAA] regulations provide that noise exposure to average sound levels of less than 85 decibels is compatible with residential development. However, this was a prediction of noise levels undertaken in 2002, not of actual noise levels now affecting the Gabrys['] [P]roperty. It was also an average; the maximum noise levels recorded were 98.2 decibels. Neither party measured the actual noise levels at the Gabrys['] location for purposes of this suit.

. . . . The [Airport Authority] has no records of the number of planes taking off and landing on a daily or nightly basis from Runway 13 or the times they use the runway, and did not refute the testimony that jets are landing throughout the day and night on Runway 13.

Trial Ct. September 14, 2017 Op. at 8 (citations omitted). "Because the testimony accepted by the trial court here provides substantial evidence to support its findings, we will not disturb those findings on appeal." *Lehigh-Northampton Airport Auth.,* 728 A.2d at 991. Accordingly, the trial court did not abuse its discretion or err as a matter of law.

Lastly, the Airport Authority argues that the trial court erred by failing to properly articulate the extent of the taking. Specifically, the Airport Authority questions whether the trial court determined that an air easement was taken or a fee simple taking of all or a portion of the Gabrys' Property.

The trial court's order provides, in relevant part:

[T]he [trial] court finds that:

1. A condemnation of [the Gabrys'] residence at 364 Sidney Avenue, Pocono Summit, Pennsylvania by the [Airport Authority] occurred on September 21, 2010.

2. The Gabrys[] have been substantially deprived of the beneficial use and enjoyment of their [P]roperty by the landing and taking off of aircraft from Runway 13 of the [Airport Authority], resulting in a de facto taking of their [P]roperty.

Trial Ct. September 14, 2017 Op. at 10. First, the trial court determined that a condemnation occurred on September 21, 2010. Second, by determining that the Gabrys have been substantially deprived of the beneficial use and enjoyment of their Property by the landing and taking off of aircraft from the Airport Authority's Runway 13, the trial court found a de facto taking of an air easement over the Property. *See In re Flowers,* 734 A.2d 69 (Pa. Cmwlth. 1999) ("Because . . .

13

[l]andowners were deprived of the beneficial use and enjoyment of their property, by definition, a de facto taking of an air easement over [l]andowners' property occurred[.]") (italics omitted). Thus, contrary to the Airport Authority's argument, the trial court clearly defined the extent of the taking.

Moreover, the law is well-established that in condemnation proceedings, the extent of the taking cannot be more than is needed to carry out the public purpose of the body on which the power is conferred. *See Commonwealth v. Renick,* 342 A.2d 824 (Pa. Cmwlth. 1975). Here, the Airport Authority only "needs" the air space. Further, the "interference with [the Gabrys'] fee interest goes to the question of the extent of damages, which is a matter for the Board of Viewers[.]" *Westrick v. Approval of Bond of Peoples Nat. Gas Co.,* 520 A.2d 963, 966 (Pa. Cmwlth. 1987).

For all of the above reasons, the trial court's order is affirmed.


_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wladyslaw Gabrys and       :
Natalia Gabrys              :
                            :
          v.              :
                            :
Pocono Mountains Municipal    :
Airport Authority,           :   No. 1485 C.D. 2017
               Appellant    :

## O R D E R

AND NOW, this 15th day of October, 2018, the Monroe County Common Pleas Court's September 14, 2017 order is affirmed.

_____
ANNE E. COVEY, Judge